No. 99,235

In the Matter of the Care and Treatment of DARWIN C. WILLIAMS.

(253 P.3d 327)

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 28, 2009.

Opinion filed April 22, 2011.

*Catherine A. Zigtema*, of Maughan & Maughan LC, of Wichita, argued the cause, and *Matthew M. Dwyer* and *Carl F.A. Maughan*, of the same firm, were on the brief for appellant.

*Kristafer R. Ailslieger*, assistant solicitor general, argued the cause, and *Nola F. Wright*, assistant attorney general, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal raises the issue of whether there was sufficient evidence to support a district court's determination that an individual is a sexually violent predator pursuant to the Sexually Violent Predator Act (SVPA), K.S.A. 59-29a01 *et seq.* The Court of Appeals held the evidence was insufficient and reversed the district court, at least in part because the individual had scored less than 50 percent in all but one category on actuarial tests designed to predict the probability that a person with the individual's characteristics would commit a sexually violent act in the future. *In re Care & Treatment of Williams*, No. 99,235, 2009 WL 2762455, at *3 (Kan. App. 2009) (unpublished opinion).

Seeking a reversal of this ruling, the State argues the Court of Appeals ignored and reweighed evidence. Specifically, the State argues the Court of Appeals put undue weight on actuarial test scores, ignored the diagnosis of the State's expert that the individual suffered from antisocial personality disorder and paraphilia "Not Otherwise Specified," and ignored the expert's opinion that the individual is a sexually violent predator. The State argues the expert's opinion and the various factors on which it was based, when viewed in the light most favorable to the State, were sufficient for us to conclude a reasonable person could find that the State proved beyond a reasonable doubt that the respondent is a sexually violent predator.

We agree and affirm the district court and reverse the Court of Appeals.

### FACTUAL AND PROCEDURAL BACKGROUND

The procedural history of this case is straightforward. Darwin C. Williams was convicted in 1987 of two counts of indecent liberties with a child pursuant to K.S.A. 21-3503 and was sentenced to 5 to 20 years. In May 1999, Williams was paroled, but just 6 months later his parole was revoked because of drug use. After serving more time in prison, Williams was paroled again in June 2002, but that parole was revoked approximately 6 months later in January 2003. The basis for the second parole revocation was explained

during the SVPA trial when the State's expert read from a portion of a Department of Corrections' Clinical Services Report (CSR) dated September 8, 2006. The CSR indicated that Williams' parole was revoked " 'for having sexual contact with a minor, consuming alcohol, unsuccessful discharge from SOTP [Sex Offender Treatment Program], and admitting to viewing pornographic/sexually explicit materials."

As Williams' prison term neared its end, the State filed a petition requesting the civil commitment of Williams as a sexually violent predator. The district court determined that probable cause existed for the allegation and sent Williams to the Larned State Security Hospital for evaluation. The district court also appointed a psychologist to perform an independent evaluation pursuant to K.S.A. 59-29a06(b). After being evaluated by two professionals, Williams appeared in district court and waived his right to a jury trial.

At the bench trial, the two experts gave conflicting opinions regarding whether a mental abnormality or personality disorder makes Williams likely to repeat acts of sexual violence. Dr. John Reid, a psychologist and supervisor at Larned State Security Hospital, testified for the State. The other expert was Dr. Robert Barnett, the clinical psychologist and board certified forensic psychologist who had been appointed by the district court. Dr. Barnett had previously worked for the Department of Corrections as chief psychologist, evaluating inmates and supervising other psychologists, and in that capacity had previously evaluated Williams. Both experts also provided written psychological evaluations of Williams.

*State's Expert Opines Williams is a Sexually Violent Predator*

The State's expert, Dr. Reid, testified to his experience and the assessment tools he used in evaluating Williams. He indicated he had performed 17 or 18 prior sexual predator evaluations and had concluded that 60 to 65 percent of those individuals were not sexual predators. Focusing on his evaluation of Williams, Dr. Reid explained that, among other tests, he used the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) and the Static-99 test. Both assessment tools are designed to measure the risk of sexually violent recidivism. On the MnSOST-R, Williams scored in

the Level 2, moderate category for sexual recidivism with a 29 percent risk of reoffending. On the Static-99, he scored in the moderate to high risk category with a sexual recidivism risk of 33 percent within 5 years, 38 percent within 10 years, and 40 percent within 15 years. His violence recidivism was scored at 42 percent within 5 years, 48 percent within 10 years, and 52 percent within 15 years.

Dr. Reid also testified to the opinion he formed based on his evaluation of Williams. Dr. Reid concluded Williams' intellectual functioning is "borderline." As to a diagnosis of Williams' mental condition, Dr. Reid opined that Williams suffers from alcohol dependence, substance abuse, exhibitionism, and paraphilia "Not Otherwise Specified" (paraphilia NOS). Dr. Reid explained that paraphilia NOS is a diagnosis of sexual acting out with underage individuals though they are not considered children. "One might also call it 'with hebephilia tendencies,' meaning adolescents." In addition, Dr. Reid diagnosed Williams with antisocial personality disorder. In Dr. Reid's opinion, the paraphilia NOS and antisocial personality disorder predispose Williams to commit sex offenses.

Dr. Reid testified that he based his opinion, in part, on consideration of Williams' past behavior and treatment, which were reported in the Department of Corrections' records. Specifically, Dr. Reid noted that Williams reoffended in 2002, even after he had received sexual offender treatment. He opined that Williams' repeated attempts at sex offender treatment and his disciplinary reports from the Department of Corrections were problematic.

Dr. Reid also based his opinion on his interview with Williams. Specifically, Dr. Reid noted that he had asked Williams to describe his internal and external triggers for sexual arousal and interaction with underage individuals. Listing external triggers, Williams included " 'school yards, shopping malls, . . . playgrounds, skating rinks, [and] pool halls.' " The internal triggers Williams listed included " 'rejection, idle time, bars, [and] using alcohol and drugs.' "

*Defense's Expert Opines Williams Is Not a Sexually Violent Predator*

Williams presented the testimony of the other expert, Dr. Barnett, who did not classify Williams as a sexually violent predator. Dr. Barnett testified that in addition to performing a psychological evaluation on Williams, he reviewed Williams' entire history and examined Dr. Reid's written evaluation. Dr. Barnett opined that Williams has a learning disorder, as opposed to borderline intellectual function. Dr. Barnett also disagreed with Dr. Reid that Williams suffers from antisocial personality disorder. He did not see in Williams the lack of empathy and lack of conscience generally associated with this disorder. Dr. Barnett found, instead, that Williams suffers from alcohol and substance abuse, and he stressed the importance of Williams' total abstinence from those.

Dr. Barnett questioned the effectiveness of the MnSOST-R and the Static-99 in that such tests do not take into account the length of incarceration or mental health/sexual treatment received by the offender. Dr. Barnett was also critical of the MnSOST-R and the Static-99 because those tests do not include a checklist for predicting psychopathy or a penile plethysmograph to measure arousal to deviant stimuli. As for Williams' alleged exhibitionism and paraphilia NOS, Dr. Barnett indicated there was no pattern or history to establish exhibitionism and that Dr. Reid's diagnosis of paraphilia NOS was too general.

On cross-examination, however, Dr. Barnett acknowledged that he had signed a Department of Corrections evaluation report in the 1980's, which indicated Williams' diagnosis as atypical paraphilia and sexual compulsion. Also, with regard to Williams' alcohol and substance abuse problems, Dr. Barnett acknowledged that it would "be disingenuous . . . to say that he wouldn't be at greater risk for a sex offense if he were drinking again." Dr. Barnett characterized Williams' sex crimes as "opportunistic."

*Williams' Testimony and Other Evidence*

Williams testified on his own behalf, explaining that he had a parole plan in place. During questioning, Williams admitted to several instances of sexual contact with minors, including both charged

and uncharged conduct. As to charged conduct, Williams made admissions regarding the two incidents leading to his convictions. On one occasion he used alcohol to bribe a 16-year-old boy into an abandoned house where he sexually assaulted him. On another occasion he coaxed a 12-year-old boy into a garage by falsely telling him there were puppies inside, sexually assaulted him, and threatened to burn down the boy's house if he told anyone. In addition to these charged instances, Williams admitted he had fondled his 6-year-old niece.

Also, Williams was asked about the incidents that led to his parole revocation. The first revocation occurred for drug use that was discovered by his parole officer after Williams was arrested for an incident that started when he met a man at a bar. Although the parole revocation was based on the positive drug test, the State questioned Williams about statements made in reports that indicated the man claimed to have been raped by Williams. Defense counsel lodged a hearsay objection, to which the State responded that it was not offering the statements for the truth of the matter asserted. The district court allowed the State to ask Williams if he remembered events recorded by his parole officer; specifically, the notes indicated that Williams had been charged with rape, the charge had been amended to sodomy, and then it was dismissed without prejudice. Williams replied, "No." At the conclusion of Williams' testimony, the district court asked some questions. During this exchange, Williams explained he took the man back to his apartment and that they "sat around and got high. . . . When he got ready to leave I wouldn't let him leave." Williams told the district court that he did not have sexual relations with the man, however.

During cross-examination, Williams was also asked about the conduct in 2002 that led to the parole revocation in early 2003. Williams explained that he had sexual contact with a male he contacted through a personal advertisement. Williams testified this person said he was 23 years old, but afterward, Williams became concerned that the man was younger. Williams testified that he never actually knew the person's age, but he admitted during his testimony that there was a possibility the young man was under the

age of 18. In addition, on cross-examination, Williams admitted watching pornography and being sexually active during parole. Williams also admitted that each time he was paroled, he had returned to drinking alcohol—a sexual trigger for him.

Additional testimony of the experts and Williams will be discussed as we review the parties' arguments.

## District Court's Findings

After hearing the testimony, the district court found beyond a reasonable doubt that Williams is a sexually violent predator. Although the court did not make specific or extensive findings on the record, the court indicated it was persuaded by Dr. Reid's report and that, although Dr. Barnett made some very valid points, Dr. Barnett's report did not "override" the opinion of Dr. Reid. The court also found it significant that Williams had been paroled twice and his treatment was "met with little to no success."

## Court of Appeals' Decision

The Court of Appeals examined the sole issue raised by Williams—whether there was sufficient evidence to support the requirement under the SVPA that he is "likely to engage in repeat acts of sexual violence" in that "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." K.S.A. 2010 Supp. 59-29a02(a), (c).

Accepting the expert opinion of Dr. Reid, the Court of Appeals was bothered by Dr. Reid's conclusion that the MnSOST-R and Static-99 tests showed that only 29 percent to 40 percent of sexual offenders like Williams will reoffend in the near future. *Williams,* 2009 WL 2762455, at *4. The Court of Appeals stated: "[T]he requirement to prove the likelihood of reoffending beyond a reasonable doubt does not justify a finding based on only a possibility." *Williams,* 2009 WL 2762455, at *3.

The Court of Appeals continued its analysis by stating: "The State's strongest arguments appear to be those that concern Williams' alleged reoffending in the past after treatment." *Williams,* 2009 WL 2762455, at *3. The court then discussed those allega-

tions and discounted their significance. Focusing on the incident that led to the first parole revocation, the Court of Appeals noted that Williams was charged with rape based on the complaints of the man Williams had taken to his apartment, but the rape charge was reduced to sodomy and eventually dismissed without prejudice. As to the second incident, the court noted that the parole violation related to an incident involving a male Williams met through a personal advertisement. Williams originally thought the person was 23 years of age but later questioned whether the person was a minor. Williams was not charged in that matter, and, according to the Court of Appeals, there was no evidence of the person's identity or actual age. *Williams*, 2009 WL 2762455, at *3-4. Consequently, the Court of Appeals stated that these two instances "do not support the position that he has sexually reoffended with a child." And "[n]either case shows a likelihood that he was engaged in sex with an underage person or forcible sex with an adult." *Williams*, 2009 WL 2762455, at *4.

The Court of Appeals did recognize that "the record is replete with many instances of substance abuse and other behavioral difficulties that could contribute to Williams losing control and reoffending. This is something Williams himself recognizes." *Williams*, 2009 WL 2762455, at *4.

After examining other cases in which Kansas appellate courts have upheld sexually violent predator findings, the Court of Appeals reversed the district court, stating:

"While there is no doubt that practically a generation ago Williams offended, it is hard to see that he is likely to offend again, beyond a reasonable doubt. Since there is no weighing of testimony in any detail in the trial court's finding, it is difficult to see how Williams, under the facts of this case, could have been found likely to reoffend beyond a reasonable doubt." *Williams*, 2009 WL 2762455, at *6.

The State filed a petition seeking this court's review of the Court of Appeals' conclusion, arguing the Court of Appeals improperly reweighed the evidence and failed to consider evidence that supported the district court's findings. This court granted the State's petition for review.

ANALYSIS

*Standard of Review*

When presented with an issue of whether evidence was sufficient to sustain the State's burden of proof in a sexually violent predator case, this court's standard of review asks whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced a reasonable factfinder could have found the State met its burden to demonstrate beyond a reasonable doubt that the individual in question is a sexually violent predator. See *In re Care & Treatment of Colt*, 289 Kan. 234, 243-44, 211 P.3d 797 (2009); *In re Care & Treatment of Hay*, 263 Kan. 822, 842, 953 P.3d 666 (1998); see also K.S.A. 2010 Supp. 59-29a07(a) (stating reasonable doubt burden). As an appellate court, we will not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Hayden*, 281 Kan. 112, 132, 130 P.3d 24 (2006); *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 371, 131 P.3d 540, *rev. denied* 282 Kan. 789 (2006).

*Overview of Sexually Violent Predator Act*

The SVPA, K.S.A. 59-29a01 *et seq.*, is an act for the restraint of sexually violent predators aimed at identifying and involuntarily civilly committing such predators to "potentially long term control, care and treatment" "in an environment separate from persons involuntarily committed" for other reasons. K.S.A. 59-29a01. K.S.A. 2010 Supp. 59-29a02(a) defines a "sexually violent predator" as any person who has been convicted of or charged with a "sexually violent offense," as defined, and "who suffers from a mental abnormality or personality disorder which makes the person "likely to engage in repeat acts of sexual violence." A "sexually violent offense" is defined as any of the sex-related offenses listed in K.S.A. 2010 Supp. 59-29a02(e). The phrase "likely to engage in repeat acts of sexual violence" means a person's "propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." K.S.A. 2010 Supp. 59-29a02(c).

The Court of Appeals categorized these definitions into three elements, stating: "Under the statute, there are three elements of

proof necessary to establish that an individual is a sexually violent predator: (1) The respondent has been convicted of or charged with a sexually violent offense, (2) the respondent suffers from a mental abnormality or personality disorder, (3) the mental abnormality or personality disorder makes the respondent likely to commit repeat acts of sexual violence." *Williams*, 2009 WL 2762455, at *1. This listing is incomplete, however, and does not account for an element that was imposed by the United States Supreme Court when it considered the constitutionality of the Kansas statute.

The additional element was imposed in *Kansas v. Crane* (*Crane II*), 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002). The decision in *Crane II* resulted from the second appeal to the United States Supreme Court in which the constitutionality of the SVPA was in question. In the first case, *Kansas v. Hendricks*, 521 U.S. 346, 370, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), the United States Supreme Court held the statutory requirement that the individual have a "mental abnormality or personality disorder" satisfied substantive due process because it "narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." *Hendricks*, 521 U.S. at 358. Applying that holding in *In re Care and Treatment of Crane* (*Crane I*), 269 Kan. 578, 580-81, 7 P.3d 285 (2000), this court held that *Hendricks* requires a "finding that the defendant cannot control his dangerous behavior." *Crane I*, 269 Kan. at 586. The State filed a writ of certiorari, arguing that this court applied that requirement in a way that imposed on the State a burden to always prove that the individual was completely unable to control his or her behavior. In *Crane II*, the United States Supreme Court agreed with the State that it need not prove an absolute lack of control, but it disagreed with the State's argument that commitment can occur without any lack-of-control determination. Instead, the Court held: "It is enough to say that there must be proof of serious difficulty in controlling behavior." *Crane II*, 534 U.S. at 413. The Court explained further:

"[T]his, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental ill-

ness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. [Citations omitted.]" *Crane II*, 534 U.S. at 413.

Explaining this holding, the Court noted that Hendricks suffered "from pedophilia—a mental abnormality that critically involves what a lay person might describe as a lack of control." *Crane II*, 534 U.S. at 414.

Hence, the statutory requirements combined with the holding in *Crane II* impose four elements that must be proven to establish that an individual is a sexually violent predator: (1) the individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior. See K.S.A. 2010 Supp. 59-29a02(a); *Crane II*, 534 U.S. at 413; PIK Civ. 4th 130.20.

All of these elements must be proven beyond a reasonable doubt. K.S.A. 59-29a06(a); K.S.A. 2010 Supp. 59-29a07(a), (e); see also *In re Care & Treatment of Foster*, 280 Kan. 845, 853-61, 127 P.3d 277 (2006) (although the trial is characterized as civil in nature, it possesses many characteristics of a criminal proceeding).

*First, Second, and Fourth Elements Not at Issue*

In this case, only the third element—whether Williams is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder—is placed in issue by the parties' arguments and the Court of Appeals' holding. Regarding the other elements, it is undisputed that Williams has two convictions for indecent liberties with a child; thus, the first element is satisfied. And, although pointing out that Dr. Barnett, Williams' expert witness, did not diagnose him with a mental disorder—rather, a problem with alcohol and substance abuse—Williams does not argue the evidence is insufficient on the second element. Indeed, Dr. Reid's diagnosis of antisocial personality disorder, alcohol dependence, substance abuse, exhibitionism, and paraphilia NOS provides evidence which when viewed in the light most favorable to the

State is sufficient to establish the second element. Further, as pointed out in the cross-examination of Dr. Barnett, in the 1980's Dr. Barnett had diagnosed Williams as having atypical paraphilia and sexual compulsion.

The fourth element—difficulty controlling behavior—was not specifically enumerated or discussed by the Court of Appeals or the parties in their briefs. At most, Williams conflates the fourth element with the third by merely mentioning "difficulty in controlling dangerous behavior" in the context of arguing that he was "not likely to re-offend and engage in repeat acts of sexual violence." We note, however, that Dr. Reid specifically enumerated this element and voiced his opinion that Williams would have difficulty controlling his behavior. He observed that despite the fact Williams had completed SOTP on multiple occasions, he had subsequently reoffended while on parole in 2002. He testified that this was "problematic, as well as the pattern . . . of disciplinary reports indicating not following [the] rules and guidelines [of] the Department of Corrections." Further, although Williams completed another round of SOTP after the 2002 incident, Dr. Reid noted that the Department of Corrections' records documented staff concerns with certain behaviors observed in Williams' treatment of other inmates. Also, as noted by the Court of Appeals, Williams had displayed difficulty in controlling his use of drugs and alcohol, which admittedly are a trigger for Williams' sexual behaviors. This pattern caused Dr. Reid to conclude Williams had difficulty in controlling his behavior.

Hence, there was sufficient evidence regarding the first, second, and fourth elements. Further, Williams has waived or abandoned any arguments he has regarding these elements by not arguing these points. See *State v. Walker*, 283 Kan. 587, 594, 153 P.3d 1257 (2007) (issues not briefed are waived or abandoned on appeal); see also *In re Care & Treatment of Miller*, 289 Kan. 218, 225, 210 P.3d 625 (2009) (this court typically requires issues addressed on petition for review to have been preserved in the Court of Appeals, if not decided there).

*Likely to Engage in Repeat Acts of Sexual Violence*

Consequently, as in the proceedings before the Court of Appeals, the focus before us is on the third element—whether it is likely Williams will commit repeat acts of sexual violence because of a mental abnormality or personality disorder. The district court did not make specific findings on this point. When, as in this case, a party fails to object to the lack of findings before the district court, an appellate court presumes that the district court made the factual findings necessary to support its decision. See *State v. Gaither*, 283 Kan. 671, Syl. ¶ 5, 156 P.3d 602 (2007); *Hay*, 263 Kan. at 836. What we do know from the district court's comments is that the court found Dr. Reid's opinion persuasive. We, therefore, must examine whether Dr. Reid's report and testimony established the third element of the sexually violent predator definition.

This task is made easy by the structure of Dr. Reid's testimony, where the State asked about each element specifically. Regarding the third element, Dr. Reid stated his opinion that Williams is likely to engage in repeat acts of sexual violence and then testified that his opinion was "based on a pattern of history before incarceration and also while incarcerated as well as the intransigent nature of Antisocial Personality Disorder and also paraphilias are notoriously difficult to correct." He added that Williams' past behaviors had been sexually motivated rather than being "an afterthought" to a crime.

Despite this statement of the basis for his opinion, which did not specifically depend on the actuarial tests, the Court of Appeals focused on the statistical data from the risk assessment tools. The Court of Appeals compared this case to other cases where offenders were found to be sexually violent predators. Although it could find no cases where a sexually violent predator determination had been reversed on appeal due to insufficient evidence, the panel believed the percentages of risk in Williams' case, generated by the actuarial tests, were "rather low in comparison to other defendants who have been found to be sexually violent predators." *Williams*, 2009 WL 2762455, at *6.

Before this court, the State suggests that the Court of Appeals relied too heavily on the need for a test to prove that Williams

would reoffend. Clearly, the law does not require the State to prove that an offender will reoffend. See *Crane II*, 534 U.S. at 412 ("Insistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities."). But the Court of Appeals did not hold the State to this standard; rather, it appropriately noted that the State had to prove beyond a reasonable doubt that Williams is " '[l]*ikely* to engage in repeat acts of sexual violence.' " (Emphasis added.) *Williams*, 2009 WL 2762455, at *3 (quoting K.S.A. 2010 Supp. 59-29a02[a]); see *In re Care & Treatment of Ward*, 35 Kan. App. 2d at 371-72.

Nevertheless, the Court of Appeals appears to have given considerable weight to the fact that Williams' scores did not exceed 50 percent on actuarial tests. Requiring that threshold to be met is problematic for several reasons. First, there is no authority supporting a requirement that the State use a particular method of proof or a particular diagnostic tool, such as an actuarial test. Nor is there support for suggesting that if an actuarial test is used, a particular percentage or category of risk must be shown on the actuarial risk assessment test before an offender may be characterized as a sexually violent predator.

In fact, both experts in this case were critical of the actuarial tests and, while considering the tests, emphasized other factors as the basis for their opinions. Dr. Reid, while noting that Williams' score on the Static-99 placed him in the moderate to high risk category of sexual recidivism and his violence recidivism was scored at 52 percent within 15 years, suggested the risk could be higher. In Dr. Reid's written evaluation, which was admitted into evidence, he stated that "it is likely that risk assessment instruments may underestimate the degree of recidivism" over the lifespan of the offender. Both experts explained to the district court that these actuarial tests look at the population of sex offenders who have a similar history and characteristics to the person being tested. The score is then based on this group's known history of reoffending. According to Dr. Reid, this method may underestimate the probability that an offender will reoffend because it does not account for statistics regarding unreported and unsolved sex crimes.

Dr. Barnett shared other concerns about the adequacy and accuracy of the tests. Speaking of the MnSOST-R, Dr. Barnett stated: "[T]here's lots and lots and lots of problems with this test and others." He referred to the tests as a "good first step" but indicated recent articles suggested these tests were no better at predicting recidivism than a method of using base rates of recidivism of all sex offenders. In his view the assessment needs to be individualized and based on the individual's history and records and an assessment of both static and dynamic factors.

Given the criticism of the assessment tools by both experts, a rational factfinder could have placed little or no weight on the test scores and could have relied on other aspects of the experts' opinions. Consequently, the State's criticism that the Court of Appeals placed undue weight on the test scores is well placed.

Further, even if we compare Williams' scores to others who have been found to be sexually violent predators, we find other Kansas cases where the individual scored below 50 percent on most scores and overall fell within the same moderate to high risk category as Williams. *Cf. In re Care & Treatment of Goeminne*, No. 99,692, 2009 WL 743921 (Kan. App. 2009) (unpublished opinion) (Static-99 test indicated moderate-high risk; MnSOST-R indicated low risk); *In re Care & Treatment of Anderson*, No. 95,441, 2007 WL 1175848 (Kan. App. 2007) (unpublished opinion) (Static-99 test indicated 40 percent within 5 years, 45 percent within 10 years, and 52 percent within 15 years; MnSOST-R indicated 8 percent within 6 years). In yet others, scores were similar but slightly higher. See *In re Care & Treatment of Colt*, 39 Kan. App. 2d 643, 652-53, 183 P.3d 4 (2008), *aff'd* 289 Kan. 234, 211 P.3d 797 (2009) (Static-99 test indicated 39 percent within 5 years, 45 percent within 10 years, and 52 percent within 15 years; MnSOST-R indicated high risk of reoffending at 54 percent within 6 years). Still others placed the offender in a higher category of risk. See *In re Care & Treatment of Pitts*, No. 97,349, 2008 WL 3003822 (Kan. App. 2009) (unpublished opinion), *rev. denied* 287 Kan. 765 (2009) (actuarial tests showed high risk of reoffending); *In re Care & Treatment of Oldham*, No. 91,228, 2004 WL 2047552 (Kan. App. 2004) (unpublished opinion) (Static-99 indicated medium-high

risk; MnSOST-R indicated 88 percent within 6 years); *In re Care & Treatment of Teer*, No. 89,652, 2004 WL 1191445 (Kan. App. 2004) (unpublished opinion), *rev. denied* 278 Kan. 845 (2004) (Static-99 indicated high risk; MnSOST-R indicated 70 percent which is high risk). Despite the fact that Williams' scores are similar to those in some of these cases, we agree with the Court of Appeals that low scores on the actuarial tests weigh against finding the State has met its burden. However, other evidence could convince a rational factfinder that the State has met its burden beyond a reasonable doubt, especially when, as in this case, both experts based their opinions on factors other than the tests.

Implicitly, the Court of Appeals recognized this point because its decision was not based solely on the test scores. The court noted that the State's best argument was that Williams had reoffended. Yet, according to the Court of Appeals, the record is not clear as to the nature and dates of such alleged offenses, the alleged conduct consisted of uncharged sexual activity, and there was no evidence that there had been a reoffense. *Williams*, 2009 WL 2762455, at *3-4. The State, in its petition for review, argued that these conclusions ignore evidence admitted at the SVPA trial. Our review of the record confirms that the State's argument is valid; there is evidence that Williams reoffended and engaged in practices that Dr. Reid found were significant indicators of a failure to control behavior.

Specifically, as previously discussed, there was evidence that Williams' second parole violation was based in part on a finding that Williams had engaged in sexual conduct with an underage male. At the SVPA trial, Williams testified he did not know if the other person was under 18, a point of focus for the Court of Appeals. Nevertheless, this testimony is contrary to Williams' prior statements, and these statements were in evidence at the SVPA trial. Specifically, Dr. Reid testified, without objection, that the CSR reported Williams' parole was revoked in early 2003 "due to his admission of having a sexual encounter with an underage male he met through a dating advertisement." This admission was apparently made during the investigation of a possible parole violation. See *Bankes v. Simmons*, 265 Kan. 341, 352-53, 963 P.2d 412,

*cert. denied* 525 U.S. 1060 (1998) (Department of Corrections "can insist that the [writ of habeas corpus] petitioner admit responsibility, so long as his or her admission is not used against the petitioner in later *criminal* proceedings."). In this civil trial, Williams' prior admission that he engaged in a sexual encounter with an underage male approximately 6 months after being released on parole could be considered by the SVPA factfinder.

The other incident characterized as a "reoffense" by the State involved the charges that led to the first revocation of Williams' probation. The Court of Appeals, as previously noted, described an incident in which Williams picked up an adult male at a bar, took the man to Williams' apartment, and then engaged in sexual relations with him. According to the Court of Appeals, rape charges were originally brought but were reduced to sodomy and then dismissed without prejudice. The Court of Appeals characterized this incident as "consensual sodomy," citing *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (concluding a state may not prohibit two adults from engaging in private, consensual sexual practices).

The basis for the Court of Appeals' conclusion is unclear. As previously discussed, the State cross-examined Williams regarding the incident, and Williams testified he did not remember the events as stated by his parole officer. After both parties had finished questioning Williams, the district court asked some questions, including whether Williams had sexual relations with the man. Although it is in the course of these questions that Williams admitted he did not let the man leave when he wanted to, Williams denied having sex. Hence, the evidence at the SVPA trial established that charges were filed, but there is no evidence to substantiate the charges or even that there was consensual sodomy. Thus, the Court of Appeals makes a valid point that there is no evidence of a sex crime related to the earliest parole violation. However, we find no argument in the State's brief before the Court of Appeals suggesting that there was evidence of a sex crime being committed during Williams' first period of parole.

More importantly, this absence of proof regarding a possible sex crime during the first period of parole does not undercut Dr. Reid's

opinion or the reasons he gave as the basis of his opinion. Dr. Reid explained that the reasons he believed Williams is likely to engage in repeat acts of sexual violence were the "pattern of history before incarceration and also while incarcerated as well as the intransigent nature of Antisocial Personality Disorder and also paraphilias are notoriously difficult to correct." In further support of his opinion, Dr. Reid discussed the 2002 incident that led to the second parole revocation. Dr. Reid found it significant that Williams had completed SOTP multiple times and still engaged in a sexual encounter with a male who, by Williams' own admission, was underage.

Granted, the 2002 incident was uncharged conduct. However, in *Hay*, 263 Kan. at 837-38, this court held that even uncharged prior conduct may be admissible against an individual in a sexually violent predator commitment proceeding. But this court did caution in *Miller* that "the State's sponsorship of evidence of crimes with which a respondent has been charged but that have later been dismissed for lack of evidence or misidentification is playing with fire." *Miller*, 289 Kan. at 229. *Miller* involved a jury trial, and evidence in the SVPA trial included, *inter alia*, a charging document from a 1992 burglary, which included an attempted rape that was later dismissed, and testimony from a State psychologist about the respondent's numerous other prior crimes and civil wrongs, some with no sexual component and some never proved. The jury was made aware of the dismissals, however. This court rejected the notion that any knowledge the jury had about specifics in Miller's charging and conviction history was inaccurate or that the respondent was denied a fair trial. *Miller*, 289 Kan. at 230.

In this case, the district court, acting as the finder of fact, was well aware that the conduct was uncharged. It heard Williams' denial of any sexual contact with the man who brought the rape charge in 1999, and it heard Dr. Reid read from the records that reported Williams' admission to sex with an underage male in 2002. The evidence also established that this admission was made during the investigation of a parole violation, and the district court heard Williams testify as to his motivation to "just go back to prison and just do my time and then I don't have to worry about, you know, the parole officer telling me what I can and I cannot do, who I can

and cannot hang with." Thus, the district court was in a position to assess what, if any, weight to give to the uncharged or unproven crimes.

The Court of Appeals ignored the evidence of Williams' admission regarding the 2002 incident and also found that the 1987 charged crimes were mitigated by the passage of time and by Williams' completion of additional sex offender treatment. Dr. Reid discussed these repeated courses, cataloguing the various treatment programs—both while in custody and while on parole. However, after citing the completion of the final treatment program in 2006, Dr. Reid noted that the staff's discharge notes raised concerns about Williams befriending younger men in the unit, "manipulative behaviors," the need to increase his "self-disclosure," and the need for "greater accountability for deviant behavior."

In other words, while the Court of Appeals made valid points regarding the evidence, there is other evidence that weighs against each point. If we were weighing the evidence and assessing credibility, we might reach a different result from that of the district court. But that is not our role and should not have been the role of the Court of Appeals. Rather, we look at all of the evidence in the light most favorable to the State to determine if a reasonable factfinder would find the State had met its burden.

Highly summarized, the evidence that supported the State's case includes evidence that the sexual assessment tests placed Williams in a moderate to high risk of recidivism, staff members were concerned about lapsing behaviors while Williams was in prison, Williams had engaged in what were viewed as high risk behaviors while on parole despite repeated participation in SOTP, Williams admitted to engaging in sex with an underage individual while on parole, and Williams admitted to difficulty controlling his use of alcohol and drugs. Moreover, Dr. Reid opined that Williams is likely to reoffend because he suffers from paraphilia NOS and an antisocial personality disorder which predispose Williams to commit sex offenses.

As is often true in cases such as this, the dispute became a battle of the experts. The district court that heard their testimony found Dr. Reid's opinion to be more persuasive. This opinion and the

factors on which it was based presented sufficient evidence for a rational factfinder to have found, beyond a reasonable doubt, that Williams is a sexually violent predator as defined by the SVPA.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

MERLIN G. WHEELER, District Judge, assigned.

\* \* \*

ROSEN, J., dissenting: I respectfully dissent from the majority opinion, which continues to deny basic evidentiary safeguards when a judge or jury is making the determination of whether a person is a sexually violent predator. Involuntary commitment under K.S.A. 59-29a01 *et seq*. requires the State to meet the highest of burdens and should afford those accused the greatest protections that the law allows. For the reasons stated in my dissenting opinion in *In re Care & Treatment of Miller*, 289 Kan. 218, 232-33, 201 P.3d 625 (2009), I would hold that the court cannot consider dismissed charges of criminal wrongdoing or uncharged sexual conduct absent a K.S.A. 60-455 analysis.

The legislature recognized that the long-term, and in most cases, lifetime involuntary commitment of citizens based on speculation and conduct that has yet to occur requires the greatest procedural safeguards that the law will allow. We should not abandon the evidentiary safeguards provided by K.S.A. 60-455 by narrowly construing the statutory language and ignoring the core purpose and underlying rationale of the statute. Evidence of prior bad acts should not be admissible to prove a person's disposition to commit sexually violent crimes at some unspecified future time absent our current K.S.A. 60-455 analysis. *In re Care & Treatment of Miller*, 289 Kan. at 232-33 (Rosen, J., dissenting).

Without consideration of the dismissed charges, which appear to have been based on consensual sexual activity between adults, and the uncharged and unproven sexual conduct, only the test scores remain to support a finding that Williams is "likely to engage in repeat acts of sexual violence." K.S.A. 2010 Supp. 59-29a02(a), (c). As such, the Court of Appeals did not put undue weight on these test scores. The Court of Appeals was right to be wary of these test scores. Even viewed in the light most favorable to the State, it is difficult to see how a 29 percent risk of reoffending or sexual recidivism risks of 33 percent within 5 years, 38 percent within 10 years, and 40 percent within 15 years demonstrate beyond a reasonable doubt that Williams is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder.

Further, the majority gives short shrift to the fourth element, that the individual has serious difficulty controlling his dangerous behavior, in large part because the Court of Appeals opinion misstated the elements required for the involuntary commitment of sexually violent predators. Williams' argument on this point is admittedly limited, arguing only that both experts agreed that if Williams were able to stay sober, he would be far less likely to reoffend. The Court of Appeals recognized that "the record is replete with many instances of substance abuse and other behavioral difficulties that could contribute to Williams losing control and reoffending. This is something Williams himself recognizes." *In re Care & Treatment of Williams*, No. 99,235, 2009 WL 2762455, at *4 (Kan. App. 2009) (unpublished opinion). However, substance abuse, in and of itself, is not sufficient to prove that Williams has serious difficulty controlling his dangerous behavior. Instead, it is the uncharged and unproven conduct that again provides the foundation for the majority's rationalization that the fourth element has been proven beyond a reasonable doubt.

For these reasons, I would affirm the Court of Appeals.