NOT DESIGNATED FOR PUBLICATION

No. 116,600

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
TIMOTHY BURCH.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; CONSTANCE ALVEY, judge. Opinion filed September 8, 2017. Affirmed.

*Timothy J. Burch*, appellant pro se.

*Dwight R. Carswell*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., LEBEN and BRUNS, JJ.

LEBEN, J.: Timothy J. Burch was civilly committed to the Sexual Predator Treatment Program at Larned State Hospital in 2002. Ten years later, he petitioned the district court for transitional release from that program. After a trial in May 2015, a jury found that it wouldn't be safe to release him.

Burch appeals, arguing that the evidence wasn't sufficient to support the jury's conclusion. After reviewing the evidence, we must disagree with Burch; while one expert testified that it would be safe to release him, the State's expert said that it wouldn't be. It was also undisputed that Burch hadn't participated in the treatment program since 2009. So a reasonable jury could have concluded that the State had proved beyond a reasonable doubt that Burch's mental abnormality or personality disorder remained such that it wouldn't have been safe to release him and that he'd be likely to commit acts of sexual

violence if released. As an appellate court, we cannot reweigh the evidence presented at trial; that's the job of the fact-finder, here a jury. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 1989, Burch pled guilty to and was convicted of several sex crimes involving teenage boys, including aggravated criminal sodomy, indecent liberties with a child, and sexual exploitation of a child. After Burch served his prison sentence, the State asked the district court to civilly commit Burch to the Sexual Predator Treatment Program at Larned State Hospital. Burch stipulated that he met the statutory definition of a "sexually violent predator" based on his criminal convictions and his diagnosis of pedophilia, and the district court civilly committed him. Kansas law defines the term "sexually violent predator" to mean "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence" K.S.A. 2016 Supp. 59-29a02(a). Burch has remained involuntarily committed at Larned State Hospital since June 2002.

In 2012, the district court appointed Dr. Robert Barnett, a licensed clinical psychologist who has experience diagnosing sex offenders and does not work within the Sexual Predator Treatment Program, to evaluate Burch's mental condition. Dr. Barnett concluded that Burch "did not meet the diagnostic criteria for pedophilia" and would "be a good candidate for conditional release." Based on this evaluation, Burch filed several motions asking the court for transitional or conditional release from Larned State Hospital. In May 2013, the State agreed that based on Dr. Barnett's evaluation, there was probable cause for a full evidentiary hearing to determine whether Burch was ready for a transitional release. At a hearing on that issue, the State would have the burden to prove beyond a reasonable doubt that Burch's "mental abnormality or personality disorder

2

remains such that [he] is not safe to be placed in transitional release and if transitionally released is likely to engage in acts of sexual violence." K.S.A. 2016 Supp. 59-29a08(c).

Two years later, in May 2015, the district court conducted a jury trial on Burch's petition for transitional release. Because Burch's appeal challenges the sufficiency of the evidence, we review the trial testimony in detail, beginning with a description of the Sexual Predator Treatment Program.

Keri Applequist, a licensed clinical psychotherapist who had worked in the treatment program since 1998, testified about the nature and structure of the program. At minimum, the residents participate in 2 to 3 hours of group therapy per week and see their individual therapist once a quarter. The program has five phases that take place in the secured facility of Larned State Hospital and two that take place elsewhere. See generally *In re Care & Treatment of Burch*, 296 Kan. 215, 220-21, 291 P.3d 78 (2012).

Phase one is an orientation phase that usually spans a resident's first 6 to 9 months in the program. In phase two, the residents take core classes on relapse prevention, cognitive skills relationship skills, and anger management; participate in psychotherapy groups; and review their own sexual history. In phase three, the residents take advanced core classes, begin working on their relapse-prevention plans, and take polygraphs about victim disclosure and sexual history. In phase four, residents complete their relapse-prevention plans and add letters related to future employment and support networks out in society.

After phase four, residents appear before the progress-review panel made up of people from outside the treatment program, and the panel decides whether the resident is ready to move to phase five. Phase five includes classes on community reintegration and job skills as well as a series of escalating community outings. The outings help address residents' fears and anxieties about being out in regular society and allow therapists to

3

observe the residents' reactions and behaviors around other people and children. The first community outings are trips within the grounds of Larned State Hospital. Then the residents go on dining outings to nearby restaurants, then on shopping outings, and then on activity outings. After each community outing, residents must complete "debriefing forms" and participate in debriefing conversations about their experiences.

After completing phase five, the resident meets with the progress-review panel again, and the panel decides if the resident is ready for phase six, which involves moving to a reintegration facility at another state hospital. The details about phase seven aren't clear from the record in our case, but the Kansas Supreme Court has described it as a "transitional release" in which "the committed person remains in [State] custody but lives independently or in a halfway house under State supervision." *Burch*, 296 Kan. at 220.

Aside from these phases of treatment, at any point during treatment at Larned, a resident can petition the court for transitional release from the program. See K.S.A. 2016 Supp. 59-29a08. Conditional release follows transitional release and involves a minimum of 5 years of court supervision but no further participation in the treatment program. Final discharge follows conditional release. See L. 2017, ch. 83 (amending the Kansas Sexually Violent Predator Act to clarify the order of transitional release, conditional release, and final discharge).

Applequist said there were then 232 people in the Sexual Predator Treatment Program, with 15 to 20 people being added each year. She said most of the 232 were still in treatment at Larned, but six were at the reintegration facilities, two were on transitional release, six were on conditional release, and three had been finally discharged from the program.

She testified that she had begun treating Burch in October 2005 when he had advanced to phase four. She said that he did well in phase four and moved on to phase

4

five, in which he completed all of the Larned-based outings, all of the dining outings, and some of the shopping outings, but didn't get to the activity outings. She said she attended a few community outings with Burch and didn't observe any behaviors of a sexual nature. Applequist said that while in this phase, Burch began having a lot of anxiety related to the outings; she said that Burch did not like filling out the required paperwork after the outings and would ask for extra time to complete it on his own. She said that Burch was anxious about the level of scrutiny applied to the outings and "was not comfortable sharing emotional issues in groups or on the outing paperwork." Applequist also described Burch as anxious about whether he would progress to the next phase but unwilling to talk about that anxiety (although she also said he had begun asking for extra individual therapy). Overall, she said that Burch struggled in phase five.

In January 2008, while still in phase five, Burch was caught with several items he wasn't permitted to have—a glass cologne bottle and two inappropriate movies (one with sexual themes and frontal male nudity and one foreign film featuring young boys at a boarding school). (The movies had initially been approved but were later said by program staff to be inappropriate.) According to Applequist, Burch wasn't actually moved to a lower phase because of this incident, but the incident made Burch so angry that he stopped participating in the program. Because he had stopped participating in the program, he was reduced to phase four in January 2009.

Burch agreed that he had stopped participating in the treatment program. He testified that because he had been through phases three and four before, he didn't need to go through them a second time. He characterized his attitude toward the program as "frustrated." He testified that he had benefited from the treatment program but that there was nothing more for him to learn there. He said that he hadn't updated his relapse-prevention plan (a 62-page document) since finishing it in 2006; he said he didn't see a reason to do so, because his conditions hadn't changed.

5

Applequist testified that she hadn't seen Burch since he had been reduced to phase four in January 2009. Thus, she said that she had no opinion about whether Burch's mental abnormality or personality disorder remained such that he needs to be in secure confinement as opposed to transitional release. She did say that generally speaking, she wouldn't recommend a person for release if that person hadn't updated a relapse-prevention plan and had stopped working the program.

Dr. Okey Nwachukwu-Udaku, who goes by Dr. Okey, also testified. He has worked at Larned since 2010. Burch is one of his patients, and he said he was familiar with Burch's treatment records. He confirmed that Burch didn't participate in the treatment program: he didn't go to group therapy, didn't journal his sexual fantasies, didn't go to individual therapy, and didn't take polygraphs. Dr. Okey testified that a refusal to participate in treatment increases the chances of reoffending. He said that Burch's diagnoses—psychopathy, pedophilia, antisocial personality disorder, and narcissistic personality disorder—remained unchanged. He called them "lifetime" diagnoses and noted that while they will never change, treatment can lower the risk level created by them. In Dr. Okey's view, Burch hadn't fully addressed his underlying diagnoses; Dr. Okey said that the incident with the inappropriate videos and Burch's refusal to participate in the program led him to conclude that Burch was not safe to be placed in a less restrictive environment. Dr. Okey also said that Burch was likely to commit acts of sexual violence if released into the community and that Burch's psychopathy, in particular, increased the likelihood that he would reoffend. Dr. Okey did admit that his opinion was based only on reviewing Burch's records because he'd only seen Burch once in the last year and hadn't been able to evaluate him. Burch admitted that he had refused to be evaluated by Dr. Okey.

Dr. Barnett also testified. He is a clinical psychologist based in Lawrence and Topeka with experience in diagnosing sex offenders. He evaluated Burch in 2002 (when Burch was committed) and in 2012.

Dr. Barnett disagreed with Burch's diagnoses of pedophilia, antisocial personality disorder, and narcissism. He said that Burch's scores on a diagnostic test for psychopathy showed that he didn't suffer from that condition, either. He testified that Burch had been overdiagnosed and cited the American Psychiatric Association's position that "there is no diagnosis that implies the inability to control sexual behavior." In Dr. Barnett's opinion, Burch was fully capable of controlling his own behavior and was safe to be placed in transitional release. Dr. Barnett's only diagnosis was that Burch suffered from alcohol and substance abuse but had been in remission for 25 years.

After the State presented its evidence, Burch's lawyer asked for a directed verdict, arguing that the State hadn't presented sufficient evidence for the jury to find in its favor. The district court denied that motion. The jury found that Burch's mental abnormality or personality disorder remained such that he wasn't safe to be transitionally released and that, if transitionally released, Burch was likely to engage in acts of sexual violence.

Burch has appealed to our court.

ANALYSIS

Burch's brief—which he wrote himself, without an attorney—lists two issues for this appeal. He challenges both the district court's denial of his motion for a directed verdict (which is now called "judgment as a matter of law") and the sufficiency of the evidence supporting the jury's verdict.

When reviewing the denial of a motion for judgment as a matter of law, we ask whether evidence existed from which a reasonable jury could find in favor of the nonmoving party (here, the State). *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). We also take into account the State's burden of proof; here the State had to prove

7

its case beyond a reasonable doubt. See K.S.A. 2016 Supp. 59-29a08(c). We ask essentially the same question when reviewing the sufficiency of the evidence: Are we convinced that a reasonable jury could have found the State met its burden to prove beyond a reasonable doubt that Burch wasn't safe to be released? See *In re Care & Treatment of Williams*, 292 Kan. 96, 104, 253 P.3d 327 (2011).

Since both of Burch's issues ask the same question about the sufficiency of the evidence, we will address them together. And because the jury found in favor of the State, when reviewing the evidence, we must look at it the light most favorable to the State. We cannot reweigh the evidence or express an opinion about the credibility of witnesses. *Williams,* 292 Kan. at 104.

The State was required to prove beyond a reasonable doubt that Burch's mental abnormality or personality disorder remained such that he was not safe to be placed in transitional release and if transitionally released he was likely to engage in acts of sexual violence. See K.S.A. 2016 Supp. 59-29a08(c). Dr. Okey's expert testimony provided the most support for the State's position. He said that Burch's diagnoses—psychopathy, pedophilia, antisocial personality disorder, and narcissistic personality disorder— remained unchanged. And he testified that in his opinion, Burch wasn't safe to be transitionally released and if released would likely engage in acts of sexual violence. He said Burch's psychopathy diagnosis in particular made Burch more likely to reoffend.

There was also clear evidence that Burch had stopped participating in the treatment program in 2009, which suggested that Burch's underlying diagnoses hadn't been fully treated. While Applequist couldn't give an opinion about Burch specifically, she testified that as a general matter, she wouldn't recommend someone for release if that person had stopped participating in treatment. In addition, Applequist testified Burch began struggling in the program during the phase-five community outings, which further suggested that he wasn't ready for transitional release. Based on this evidence, a jury

8

could have concluded, beyond a reasonable doubt, that Burch's mental abnormality or personality disorder remained such that he wasn't safe to be transitionally released and if released was likely to engage in acts of sexual violence.

Burch claims that Dr. Okey's opinions weren't valid because the doctor had previously declined to give an opinion about whether Burch should be released and because he never actually examined Burch. Burch argues that the jury should have relied on Dr. Barnett's testimony instead since Dr. Barnett was the only doctor who evaluated Burch for this trial. Burch accurately notes that Dr. Okey's opinion at trial—that Burch wasn't safe to be transitionally released—was inconsistent with his statement in a pretrial deposition that he could *not* recommend whether Burch should be released.

This inconsistency certainly undermined Dr. Okey's credibility, but when Burch's lawyer cross-examined Dr. Okey on this subject, Dr. Okey drew a distinction between "recommending" transitional release (which he couldn't do) and offering an "opinion" about whether a patient should be released (which he could do). Dr. Okey also explained that at the time of the deposition, Burch hadn't been one of his patients, so he hadn't had enough information about Burch to give an opinion. In the year since the deposition, Burch became one of Dr. Okey's patients.

Of course, Dr. Okey hadn't actually examined Burch, but that was because Burch refused. Burch argues that Dr. Okey's opinion was based only on a review of Burch's file, not on an actual examination of Burch, but that was all Dr. Okey could do since Burch refused to let Dr. Okey examine him.  So while the lack of an actual evaluation and the prior inconsistent statement did undercut Dr. Okey's credibility, we are not able to say that the jury couldn't rely on his testimony to reach the conclusions it announced in its verdict. As an appellate court, we do not make credibility decisions. See *Williams*, 292 Kan. at 104. Dr. Okey's opinion wasn't entirely unreliable, and the jury was entitled to rely on it rather than Dr. Barnett's opinion.

9

Burch also argues that his refusal to participate in the program isn't relevant because completing the program's many phases isn't required by statute. It's true that the statute doesn't reference the phases of the treatment program. But the jury was still entitled to infer from his refusal to participate that he was not safe to be released because his underlying mental abnormality or personality disorder remained untreated or not fully treated.

Finally, within his sufficiency argument, Burch claims that district court erred by not analyzing whether the State had proved beyond a reasonable doubt that Burch couldn't control his behavior. It is true that to prove a person is a sexually violent predator (and thus is subject to involuntary civil commitment), one of the things the State must show beyond a reasonable doubt is that the person has serious difficulty controlling his or her dangerous behavior. See *Williams*, 292 Kan. at 106. But this particular case isn't about whether Burch is a sexually violent predator—that determination took place back in 2002 when Burch was first civilly committed. In this proceeding, the State didn't have to prove beyond a reasonable doubt that Burch was a sexually violent predator—what it had to prove was that Burch wasn't safe for transitional release. See K.S.A. 2016 Supp. 59-29a08(c). This is a different question, governed by a different standard: whether "the committed person's mental abnormality or personality disorder remains such that the person is not safe to be placed in transitional release and if transitionally released is likely to engage in acts of sexual violence." K.S.A. 2016 Supp. 59-29a08(c). Even if Burch had succeeded in this case, he would still be a sexually violent predator—he would just be in transitional release rather than in the secured facility at Larned State Hospital. Because this case isn't about whether Burch is a sexually violent predator, the inability-to-control-behavior element that he points to doesn't apply at this stage of his case.

We affirm the district court's judgment.

10