NOT DESIGNATED FOR PUBLICATION

No. 114,617

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
TIMOTHY J. THOMPSON.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed July 22, 2016.
Affirmed.

*Carl F.A. Maughan* and *Sean M.A. Hatfield*, of Maughan Law Group LC, of Wichita, for
appellant.

*Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., HILL and BRUNS, JJ.

*Per Curiam:* Timothy J. Thompson asks us to overturn his commitment as a
sexually violent offender, contending he was denied a speedy trial and there was
insufficient evidence to support the jury's conclusion. We conclude to the contrary,
holding that he cannot argue a constitutional ground for the first time on appeal and there
is ample evidence in the record to support the conclusion that he is a sexually violent
predator. Thus, we affirm.

*Thompson's criminal history reveals several sexual battery convictions.*

In May 2009, Thompson pled guilty to four counts of aggravated sexual battery
against four different women. In December 2013, the State filed a petition seeking to

1

have Thompson adjudicated as a sexually violent predator and involuntarily committed for treatment.

Thompson stipulated that probable cause existed to believe that he is a sexually violent predator and he waived his right to a probable cause hearing. Accordingly, the district court sent him to Larned State Security Hospital for an evaluation under K.S.A. 2015 Supp. 59-29a05(d).

His first jury trial ended in a mistrial on February 23, 2015. Then on May 29, 2015, Thompson moved to dismiss the State's petition under K.S.A. 2015 Supp. 59-29a07(f). That statute provides: "Any subsequent trial following a mistrial shall be held within 90 days of the previous trial, unless such subsequent trial is continued as provided in K.S.A. 59-29a06, and amendments thereto." In response, the State argued that Thompson does not have a statutory right to a speedy trial because proceedings under the Kansas Sexually Violent Predator Act are civil rather than criminal. In the State's view, any time requirements contained within the Act "are intended to be directory and not mandatory and serve as guidelines for conducting [such] proceedings."

After hearing arguments on the motion and confirming that Thompson's second trial was scheduled for July 20, 2015, the district court denied the motion. It relied on K.S.A. 2015 Supp. 59-29a01(b) and *In re Care & Treatment of Hunt*, 32 Kan. App. 2d 344, 82 P.3d 861, *rev. denied* 278 Kan. 845 (2004). The court decided that the 90-day time frame described in K.S.A. 2015 Supp. 59-29a07(f) is merely a directory guideline for courts to follow in the scheduling of a new trial. It then found that because Thompson's second trial was scheduled 147 days from the date of mistrial and the State had been diligent in its efforts to retry this matter, the delay was not unreasonable.

At trial, the State presented the testimony of:

- Thompson;
- Dr. Rebecca Farr, Psy.D., a post-doctoral psychologist practicing at Larned;
- Dr. Thomas John Kinlen, Ph.D., a licensed psychologist and the superintendent of Larned;
- Rebecca Talbert, R.N., an infection control coordinator at the Lansing Correctional Facility; and
- Dr. Bradford Sutherland, Ph.D., a licensed forensic psychologist employed by Corizon Health System (a contractor used by the Kansas Department of Corrections).

In his defense, Thompson introduced testimony from Dr. Robert Barnett, Ph.D., a clinical psychologist and independent medical examiner appointed by the court.

The jury found that Thompson qualifies as a sexually violent predator subject to involuntary commitment. Based upon the jury's verdict, the district court ordered that Thompson be committed to "the custody of the Secretary of [the Kansas Department for Aging and Disability] Services for controlled care and treatment until such time as his mental abnormality or personality disorder has so changed so that he's safe to be at large pursuant to K.S.A. [2015 Supp.] 59-29a07."

*There is ample evidence to support the jury's conclusion.*

The Sexually Violent Predator Act was designed to identify sexually violent predators and civilly commit them to potentially long term control, care, and treatment in an environment separate from persons involuntarily committed for other reasons. *In re Care & Treatment of Williams*, 292 Kan. 96, 104, 253 P.3d 327 (2011). The Act, combined with the holding in *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed.

3

2d 856 (2002), which upheld the Act's constitutionality, requires the State to prove four elements beyond a reasonable doubt in order to commit someone as a sexually violent predator:

> "(1) the individual has been convicted of or charged with a sexually violent offense;
> (2) the individual suffers from a mental abnormality or personality disorder;
> (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder; and
> (4) the individual has serious difficulty controlling his or her dangerous behavior. [Citations omitted.]" 292 Kan. at 106.

See K.S.A. 2015 Supp. 59-29a02(a)-(e); K.S.A. 2015 Supp. 59-29a07.

Since Thompson stipulated that his four aggravated sexual battery convictions qualify as sexually violent offenses under K.S.A. 2015 Supp. 59-29a02(e), we need only examine the State's evidence on the remaining three elements.

Thompson claims that the State's evidence on these elements was premised upon questionable expert testimony and, thus, no reasonable factfinder could have found that he qualifies as a sexually violent predator. Naturally, the State asserts the evidence was clearly sufficient to prove beyond a reasonable doubt that Thompson is a sexually violent predator as defined by the Act.

Our approach to such issues is well established. When a challenge to the sufficiency of the evidence in a sexually violent predator case arises, we will review all of the evidence in the light most favorable to the State. We will then determine whether a reasonable factfinder could have found that the State met its burden to demonstrate beyond a reasonable doubt that the sex offender qualifies as a sexually violent predator. *In re Care & Treatment of Williams*, 292 Kan. at 104.

4

Both of the State's experts concluded that Thompson met the criteria of a sexually violent predator. Using the Diagnostic Statistical Manual for Mental Disorders (DSM-5) (5th ed. 2013), Dr. Farr diagnosed Thompson, who was one of her patients at Larned, with a frotteuristic disorder. The doctor also stated that Thompson has an anti-social personality disorder and various substance abuse disorders, including a moderate cannabis use disorder, and mild alcohol, cocaine, amphetamine, and opioid use disorders.

Dr. Farr explained that she believed Thompson met the DSM-5 criteria for frotteurism. That is "an intense sexual arousal from touching or rubbing against a non-consenting person as manifested by fantasies, urges, or behaviors" recurrent over a period of at least 6 months. This was because he had at least four confirmed victims of unwanted touching in the genitals or buttocks for his own sexual gratification. Thompson had admitted to engaging in similar behavior with at least three or four other victims; he talked about prior instances of "attempted rape and/or fondling of unsuspecting, non-consenting, and unconscious females."

Thompson had nine disciplinary reports while in the Department's custody for his four aggravated sexual battery convictions and Dr. Farr believed that two of these were for undue familiarities and one was for possession of sexually explicit material. According to the doctor, his behavior indicated that he was "continuing to have those sexual fantasies of tight jeans and what women are wearing and whatnot which triggers him."

Dr. Farr explained that she believed Thompson has an anti-social personality disorder because he exhibited an inability to conform to social norms, deceitfulness, unlawful behavior, he has a history of impulsiveness and aggression, and a reckless disregard for the safety of himself and others. Thompson has consistently been irresponsible, he could not hold a job, he abused substances, and he lacked remorse for his behaviors. Dr. Farr explained that the essential feature of an anti-social personality

5

disorder is "a pervasive pattern of disregard for and the violation of rights of others that begins in childhood or early adolescence and continues into adulthood."

Moreover, Dr. Farr performed an actuarial assessment which indicated that Thompson had "a moderate to a moderate-high risk" of recidivism within 10 years. He had a score of 4 on the Static-99R and a score of 5 on the Static-2002R, and she indicated that the actuarial instruments tend to underestimate an individual's lifetime sexual recidivism potential. Dr. Farr explained, "The Statics . . . are the best tool that we have right now to measure sexual recidivism."

Dr. Farr concluded that Thompson was "likely to continue to seek out inappropriate sexual relations with others, including vulnerable people, [and] unsuspecting people" if released into the community at large. Dr. Farr reached this conclusion based upon the following facts:

(1)     The providers of the Sexual Offender Treatment Program Thompson completed indicated that Thompson had "a poor responsivity to treatment and they were very concerned about how would he do in the community in treatment";

(2)     Thompson minimized the behaviors which led to his four aggravated sexual battery convictions and his exhibited lack of remorse;

(3)     Thompson, during his time at Larned, hit two of his peers and he was involved in an incident involving masturbation; and

(4)     Thompson did not have a viable relapse prevention plan.

When Dr. Farr asked Thompson to estimate his current level of sexual arousal on a scale of 0 to 10, Thompson replied, "[I]t's a 10 non-stop right now. Every minute of the day, every hour of the day, my sexual hormones are pedal to the metal." Likewise, during her interaction with Thompson, both as his doctor and as his evaluator, Dr. Farr noted

6

that Thompson was "sexually preoccupied" and he demonstrated "a level of impulsivity, [and] really hyper-focused, hypersexuality," which concerned her. Dr. Farr explained:

> "Well, since he was on my unit a couple of times during the evaluation—or the during the hospitalization—before his hospitalization when I interviewed him and evaluated him, he had some sexually inappropriate comments and preoccupations with female staff, particularly staff wearing tight jeans. He talked a lot about his concerns with the treatment team which I'm part of that treatment team. He talked about his concerns about —again, with the female staff wanting to perform different kinds of behaviors or acts, feeling like he's not getting his sexual needs met because he is locked up, incarcerated.
>
> "And then with me, during my evaluation he had some inappropriate moments where he was talking about trying to—it seemed as if he was trying to test my boundaries. So he would—for example, he would ask me if I knew about cunnilinctus [*sic*], which is oral sex. And, you know, just different kinds of things like that. Would I— what do I think about shaved public [*sic*] hair and what do I think about him doing that kind of stuff, and it's okay, you can talk to me about that, and trying to engage me in inappropriate discussions.
>
> . . . .
>
> "But it's the level at which he was preoccupied, not just during the evaluation but during other parts of his hospitalizations. It's—it's that part that is the red flag.
>
> "You know, he talked about—in my evaluation with me he talked about the amount of erections he has on a daily basis and said that he had one right then and there. I don't know if that's true, I don't know if that was meant to have me look at him and see. You know, there are some people with anti-social personality disorder that try to, you know, engage you inappropriately and get you to do things or shock you. So I'm not quite sure what the meaning of that was or if that was true. But these are the kinds of things that he was saying to me during the evaluation. And those are—all those, you know, the red flags that say, hey, he's really sexually preoccupied, he's really talking a lot. I mean, these are two separate evaluations, hospitalizations that I have been with him on. And that he's been on my unit and he's behaving pretty similarly in both instances."

Dr. Sutherland reached a similar conclusion to Dr. Farr. Using the DSM-5, Dr. Sutherland diagnosed Thompson with a frotteuristic disorder; schizophrenia, multiple

7

episodes, currently in partial remission; an anti-social personality disorder; and several substance abuse disorders, including a moderate alcohol use disorder, a severe cannabis use disorder, a severe amphetamine use disorder, and a severe cocaine use disorder. Dr. Sutherland premised his schizophrenia diagnosis upon reports Thompson made throughout his incarceration, which indicated that he was experiencing command auditory hallucinations and visual hallucinations. Thompson claimed that he saw people who were not really there going past his cell.

Additionally, Dr. Sutherland opined that Thompson's sexual preoccupation and his ideas of reverence and ideation of prosecution rose to the level of a delusional state. Thompson also exhibited "cognitive slippage," and Dr. Sutherland explained that "he will start talking about one thing and then bend right off into another issue," diminished emotional expression, a disorganized thought process, and avolition, which is a decrease in goal-directed activities or a lack of interest in work or social activities and interactions.

As for the frotteuristic disorder, Dr. Sutherland opined that Thompson's behavior fell within "the essence of [the] disorder," because over a 3-to-4-week period Thompson experienced "intense sexual arousal from touching or rubbing against a nonconsenting person as manifested by fantasies, urges, or behaviors." This was based upon his self-report and one of his disciplinary reports. Thompson continued to manifest similar fantasies.

Like Dr. Farr, Dr. Sutherland scored Thompson as a 4 on the Static-99R, which according to Dr. Sutherland placed Thompson's recidivism risk at a "moderate-high level" and indicated that he is "roughly twice as likely as the average sex offender to re-offend" within 5 years. And Dr. Sutherland agreed with Dr. Farr's claim that the Static-99R tends to underestimate the risk of recidivism. Dr. Sutherland also reviewed the Stable-2007 completed by the SOTP, and according to Dr. Sutherland, Thompson

8

appeared "to be at high risk relative to [the] dynamic factors" outlined on the Stable-2007.

In particular, Dr. Sutherland concluded that the following dynamic risk factors were a concern:

(1)    Thompson identified his sister as his only positive influence and he does not have "other stable support systems out there in the community";

(2)    While Thompson claimed that he was involved in a 4-year relationship, he had three arrests for domestic violence during this period, which indicates that he does not have the ability to establish and maintain an intimate marital relationship;

(3)    Thompson exhibits hostility towards women;

(4)    Thompson exhibits a "general social rejection," as his paranoid delusions include a belief that others are talking about him;

(5)    Thompson's relationships with others are superficial, at best, and he has a general lack of concern for others;

(6)    Thompson has poor impulse control;

(7)    Thompson has poor problem-solving skills;

(8)    Thompson has "no logical or goal-directed release plans for independent functioning . . . [and] no plans to remain abstinent in the community";

(9)    Thompson has negative emotionality;

(10)    Thompson is sexually preoccupied;

(11)    Thompson exhibits deviant sexual preferences; and

(12)    It is unlikely Thompson will be able to cooperate with supervision because he has had "at least one or two cases of parole revocation, and the disciplinary report history, plus there's a verbalized intent of using . . . illicit drugs as soon as he gets out, or at least when he's off paper."

9

Dr. Sutherland also noted that Thompson demonstrated sexual preoccupation during his clinical interview; in fact, at one point, Thompson indicated that he was "starved and thirsty for sex" and he was "quite verbose in explaining his sexual ruminations." In addition, Thompson told Dr. Sutherland that the SOTP was "useless" and that the administrators of that program "should be teaching us how to meet women, how to get laid, [and] get a class on how to succeed with sexy females."

Consequently, Dr. Sutherland opined that Thompson met the criteria of a sexually violent predator, as his mental abnormities and disorders increased his "risk within the community to commit further acts of sexual violence" to "such a degree that Mr. Thompson is a menace to the health and safety of others." Dr. Sutherland further opined that Thompson's lack of a viable relapse plan, his stated desire to continue smoking marijuana, and his drug and alcohol disorders increased the likelihood that Thompson would be unable to control his dangerous behavior and would engage in repeat acts of sexual violence.

On the other hand, Dr. Barnett disagreed with Drs. Farr and Sutherland. Based upon his clinical interview, the testing he performed, and his clinical judgment and experience, Dr. Barnett diagnosed Thompson with a cognitive disorder, a psychotic disorder that was in remission, and a personality disorder associated with organic difficulty which interfered with "his effective social and interpersonal functioning."

Dr. Barnett disagreed with the frotteurism diagnosis by Drs. Farr and Sutherland, which he claimed was a relatively rare condition that involved rubbing up against a person in a crowded public place for arousal purposes without triggering the victim's suspicion, rather than running up to someone, intentionally touching them, and then running away. He also maintained that Thompson did not suffer from an anti-social personality disorder: "[Thompson] has a meaningful criminal history. But it doesn't show the sort of pattern that I would expect to see in somebody with an anti-social personality

10

disorder. And certainly the offenses that led to his most recent incarceration are not suggestive to me of anti-social personality disorder."

Dr. Barnett did not perform any actuarial testing; in fact, he questioned the reliability of the Static-99 instruments with respect to recidivism testing because according to Dr. Barnett, the static instruments were normed on a Canadian offender population and they were designed to assist with parole and probation decisions, rather than placement in sexually violent offender programs. Dr. Barnett explained, "It's an actuarial instrument. It has the same problem that every actuarial instrument has. It suggests a percentage of something or other, but it cannot say for certain one way or the other."

Dr. Barnett acknowledged that Thompson spent a significant period of time talking about "sex, his sexual needs, his sexual wants." In fact, Dr. Barnett stated, "[Thompson] was verbally abusive. He—there was an avalanche of statements about sexual interest, sexual proclivities, sexual history, what his preferences were. This is one of those areas where I continually tried to redirect him and it was difficult to do." Dr. Barnett, however, indicated that he did not believe Thompson's preoccupation with sex suggested that he was a sexually violent predator that was "on the cusp" of taking action to fulfill his desires. Dr. Barnett explained that he did not believe you could connect Thompson's "constant talking about sex" to his recidivism potential:

> "I don't think that you can demonstrate that relationship. I do want to make it clear, you
> know, I have stated and my opinion is that I think he's capable of controlling his
> behavior. Whether he chooses to or not, I don't know. I think it's very difficult for him to
> control what he says."

Thompson's testimony is revealing. In particular, he testified that he successfully completed the SOTP during his incarceration and he acknowledged that during the

11

program, he completed a "individual victim form," wherein he identified seven sex offenses for which he was never arrested.

First, when Thompson was 11 years old, he fondled his 6- or 7-year-old stepsister on more than one occasion and he "tr[ied] to stick [his] penis in her but couldn't because she was too small." Second, at age 15, Thompson went to a friend's house and when an approximately 30-year-old woman in the house had a seizure, Thompson "took off her pants and tried to put [his] penis in her. But [he] couldn't get hard or when [he] got hard [he] couldn't stay hard to do it. So [he] pulled her pants up and left." Third, when he was 28 or 29, Thompson fondled the 14- to 15-year-old sister of one of his friends several times, and while Thompson conceded that she was "not the age of consent," he claimed that she was a willing participant.

Thompson further explained that on one of these occasions, he "pushed her on the couch and took her pants off halfway down and almost went to try to take her panties off but [he] stopped [himself] and got up and told her to get dressed and go home." Thompson indicated that he was proud of the self-control he exercised, but he often wondered whether "she would have told or not if [he] would have went further." Fourth, a young woman whom Thompson met at Lord's Diner agreed to accompany him to a place to get high and after using marijuana, crack, and methamphetamine, he fondled the woman against her will. Fifth, Thompson raped a woman that he found passed out after a party. Sixth, Thompson saw a woman walking ahead of him at the 2008 River Fest in Wichita and he "ran up behind her and slapped her on the ass and run off." Finally, Thompson ran up behind a woman he saw walking out of the SRS building and then he "stuck [his] hand up her skirt and grabbed her ass and ran off laughing."

Furthermore, Thompson acknowledged that when in treatment he was asked to identify "what sort of person" he is, he replied:

12

"[W]hen it comes to sex, weed, heavy metal, it's a closed subject. This is a fact, I'm going to have sex, I'm going to smoke weed, and I'm going to go listen to heavy metal or death metal until I die, get impotent, or lose my hearing, no matter how long it takes."

And it appears Thompson continues to adhere to this assessment of himself, as he sent Dr. Farr a letter on January 3, 2015, which had a poem attached to it, wherein he stated: "A higher power gave me this connoisseuring lust that is so irreversible," and he claimed "[i]t is a woman I need. Not medications."

Finally, Thompson conceded that he had difficulty controlling his behavior while incarcerated at the Lansing Correctional Facility. Nurse Talbot filed a disciplinary report against him because he told her: "[O]n my release date I don't want a relationship, I just need sex, would you hook up with me for two hours?" During her testimony, Talbot confirmed the accuracy of this statement.

After reviewing all of this in the light most favorable to the State, the evidence was clearly sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that Thompson is a sexually violent predator.

*We see no error in not dismissing this case on speedy trial grounds.*

Thompson concedes that the 90-day time frame described in K.S.A. 2015 Supp. 59-29a07(f) is directory and not mandatory. Rather, he insists that the district court erred when it denied his motion to dismiss on speedy trial grounds because the court neglected to consider the constitutional procedural due process implications of the delay which occurred in this case.

Indeed, individuals subjected to adjudication and/or commitment under the Act have a substantive due process right to liberty and, thus, such individuals are entitled to

13

constitutional due process protections which include the requirement that the person be afforded a right to be heard in a meaningful way before being deprived of life, liberty, or property. *In re Care & Treatment of Ellison*, 51 Kan. App. 2d 751, 753, 359 P.3d 1063 (2015), *rev. granted* February 22, 2016.

A panel of this court recently determined that although a commitment proceeding under the Act is civil in nature, the multifactor test set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), which the United States Supreme Court developed for trial rights in criminal cases, provides an appropriate framework for determining whether a delay in a sexual predator proceeding implicated the defendant's procedural due process right to a timely adjudication. *In re Care & Treatment of Ellison*, 51 Kan. App. 2d at 754-55.

The *Barker* model includes the following four considerations: (1) the length of delay; (2) the reasons for the delay; (3) the defendant's assertion of the constitutional right; and (4) the prejudice to the defendant arising from the delay." 51 Kan. App. 2d at 755.

Thompson maintains that his adjudication should be reversed or the matter remanded for a second hearing on his motion to dismiss because the district court "focused solely on the statutory language" of K.S.A. 2015 Supp. 59-29a07(f) and the court not only failed to address the *Barker* factors, it gave absolutely no consideration to his constitutional speedy trial right. In fact, when denying Thompson's motion, the district judge stated, "The legislature passed the law and it's not my position to, aside from constitutional issues, which there are none here, pass judgment on that law."

Thompson did not properly preserve this issue for appellate review because he did not raise a constitutional speedy trial claim in the district court. Other than making some passing comments about speedy trial rights as a constitutional right in this matter,

14

Thompson focused the entirety of his argument upon his claim that the State had violated his alleged *statutory* right to a speedy trial by failing to hold his second trial within 90 days of the mistrial. Thompson never specifically argued that his *constitutional* right to timely adjudication had been implicated.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). There are, however, three exceptions to this rule, which allow an appellate court to consider a new legal theory:

(1)     The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case;

(2)     consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and

(3)     the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008), *cert. denied* 555 U.S. 778 (2009).

Even though Thompson referred to these exceptions in his appellate brief, he provided no argument as to their applicability, and he did not file a reply brief to address the State's issue preservation claim. Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) obligates litigants to explain why an issue that was not raised below is properly before the appellate court, and our Supreme Court "recently reiterated that Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril. [Citation omitted.]" *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Therefore, we decline to reach the merits of this issue.

Finally, Thompson argues that cumulative trial errors require the reversal of his adjudication, as these errors deprived him of the right to a fair trial. We find no errors of any substance occurred during the course of Thompson's trial. When the record fails to support the errors raised on appeal by the defendant, cumulative error will not be found. *In re Care & Treatment of Miller*, 289 Kan. 218, 231, 210 P.3d 625 (2009).

Affirmed.