NOT DESIGNATED FOR PUBLICATION

No. 118,217

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
JUSTIN L. PRUITT.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed March 2, 2018. Affirmed.

*Rand Simmons*, of Simmons Law Office, of Emporia, for appellant.

*Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and BRUNS, JJ.

PER CURIAM: In order to commit someone as a sexually violent predator, the State must prove beyond a reasonable doubt: (1) the individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior. *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011). Justin L. Pruitt appeals a jury verdict finding that he is a sexually violent predator. Pruitt argues that there was insufficient evidence of the third and fourth elements. However, the State provided sufficient evidence to sustain the jury's verdict. This evidence included Pruitt's history of offending, large number of disciplinary reports in prison, failure to complete sex offender

1

treatment, diagnoses of antisocial personality disorder and voyeurism, and scores on actuarial instruments which measure risk of reoffending. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

This appeal arises from a jury decision finding that Pruitt is a sexually violent predator.

In 2002, Pruitt was convicted of one count of aggravated sexual battery and one count of aggravated burglary. The convictions arose from two separate incidents.

In one incident, police were called to an Emporia residence to respond to a report of rape. Pruitt, his school classmate, and her friend had spent the previous evening together and had all fallen asleep at the residence. The victim reported that while she was sleeping, Pruitt came into her bedroom, took off her shorts and underwear, and inserted his penis into her vagina. Pruitt then tried to insert his penis into her anus, at which point she fully woke up and pushed him off. Pruitt told police that while in the victim's bedroom, he rubbed himself against her until he had an erection. He put on a condom and removed the victim's shorts and underwear. He said that he inserted his penis into her vagina, although "the intercourse did not last long because the victim was just lying there and not responding." Pruitt said he did not know whether she was awake or asleep.

The other incident involved Pruitt intruding into a woman's house. Pruitt began by window-peeping at the woman's home. However, his behavior escalated and he ended up intruding into her home on three occasions. He took something each time. On the third occasion, the woman was home. Pruitt admitted that he touched the woman's vagina while she was sleeping. Pruitt later recanted that admission.

2

In January 2003, Pruitt was sentenced to 36 months' probation for his convictions of aggravated sexual battery and aggravated burglary. Pruitt had a number of issues on probation. A month after he was placed on probation, Pruitt's female neighbor called the police to report a suspicious person outside of her home—probation staff suspected that the person was Pruitt. Pruitt's phone line monitor was unplugged for 45 minutes on one occasion, although his mom said that it inadvertently happened while she was vacuuming. He also left the house on multiple occasions without his monitoring device. Pruitt violated his curfew a couple of times. Pruitt also admitted to trying to peek into the windows of two houses after he watched a pornographic movie with a friend. Pruitt also told his probation officer that he liked to peep on his mother while she bathed. The court revoked Pruitt's probation in July 2003 and ordered him to serve his underlying sentence.

From 2003 to 2004, Pruitt participated in the prison's Sexual Offender Treatment Program. He was terminated from the program after several months for failure to make progress. His treatment providers described Pruitt as minimally invested in the treatment process. They noted that Pruitt was "extremely guarded and responded to most questions with one-word answers." When Pruitt did provide answers, he sometimes lied. He gave inconsistent accounts of his offense. Pruitt also resisted completing his written work, even with the assistance of a tutor. Some of Pruitt's comments during the sessions were supportive of criminal behavior and violation of boundaries.

In August 2005, Pruitt was released on parole. However, the following year he violated parole and returned to prison for three months. In January 2007, he was released from prison again. In August 2007, Pruitt was arrested. He has remained in custody since that arrest.

Pruitt's 2007 arrest led to convictions for aggravated burglary and attempted burglary. The attempted burglary was of a vehicle owned by an off-duty police officer.

3

The aggravated burglary conviction arose after two women discovered Pruitt on their back porch around 1 a.m. attempting to break in to their house.

Before his prison sentence expired, the State filed a petition to commit Pruitt as a sexually violent predator. Pruitt elected to have a jury trial. Dr. Derek Grimmell and Dr. Mitchell Flesher, both experts for the State, were the only witnesses. Dr. Grimmell prepared a clinical services report for the State. Pruitt declined an interview with Dr. Grimmell, so his report was based on records that he reviewed. Dr. Flesher conducted a forensic evaluation of Pruitt in which he reviewed Pruitt's records and interviewed him. Both experts concluded that Pruitt met the criteria for commitment as a sexually violent predator.

*The expert testimony presented at trial*

Both of the State's experts diagnosed Pruitt with antisocial personality disorder. Dr. Grimmell described the disorder as "an enduring stable pattern of behavior that shows a callous indifference to rules, laws, and the rights of others." In order to diagnose a person with antisocial personality disorder, he or she must fit at least three of seven criteria listed in the Diagnostic and Statistical Manual of Mental Disorders. These criteria are failure to conform to social norms with respect to lawful behaviors, deceitfulness, impulsivity, irritability and aggressiveness, reckless disregard for safety of self or others, consistent irresponsibility, and lack of remorse. Both experts noted that Pruitt failed to conform to social norms by repeatedly engaging in acts that were grounds for arrest. They also each noted signs of deceitfulness. Dr. Flesher came to this conclusion after reviewing Pruitt's sexual offender treatment program progress notes, which indicated that Pruitt minimalized his offending conduct. Both experts also noted impulsivity in Pruitt. Dr. Flesher explained that Pruitt exhibited impulsivity by "acting without thinking in terms of the consequences of his acts," which was evident from his multiple convictions

4

and disciplinary violations. Dr. Grimmell also thought Pruitt lacked remorse, "as indicated by being indifferent to or rationalizing having hurt or mistreated others."

Both of the State's experts also diagnosed Pruitt with voyeuristic disorder. Voyeuristic disorder means that a person is "sexually aroused by seeing people who are naked or undressing, specifically, who don't know that they're being watched." Dr. Flesher explained that he based his diagnosis on "information from the records that suggest a pattern of behavior of sexual arousal to viewing someone who is unaware or unsuspecting while they're in some state of undress." Dr. Flesher thought that Pruitt's actions were worse than the typical voyeur because Pruitt had advanced past the point of viewing women at a distance.

The State's experts each concluded that Pruitt was likely to commit repeat acts of sexual violence due to his mental abnormality or personality disorder. Dr. Grimmell used two actuarial tools in his evaluation of Pruitt—the Static-99R and the Static-2002R. These tools predict whether a sex offender will reoffend, but they underestimate the risk because they only measure whether a person will be rearrested or reconvicted for a sexual offense. The Static instruments do not account for undetected offenses. Pruitt's scores on both tests placed him in the highest-risk category of offenders. Sex offenders with the same Static-99R score as Pruitt have a 20 percent reconviction rate over 5 years. About 26 percent of offenders with the same Static-2002R score as Pruitt are reconvicted.

While Dr. Grimmell relied on the Static instruments, he also testified that "[t]he two most consistent and strong risk factors for sexual offending in the future are antisocial personality disorder and deviant sexual arousal," and both of those were present in Pruitt. Dr. Grimmell's opinion was also impacted by the fact that Pruitt had failed to complete sex offender treatment three different times. Dr. Grimmell testified that entering treatment and failing to complete it "predicts greater risk of sexual offending in the future."

5

Dr. Flesher administered two tests that utilized dynamic, rather than static, factors to evaluate risk. These were the Stable-2007 and the Acute-2007. The Stable-2007 accounts for "stable but dynamic risk factors," which "would include things like significant social relationships, capacity for relationship stability, [and] hostility toward women." Pruitt scored a 12 on the Stable-2007, which indicates that he has high treatment needs. The Acute-2007 "is comprised of the dynamic factors that change very rapidly." This includes "things like current substance abuse, current victim access, [and] indications of sexual preoccupation." Pruitt also had a high score on this test, which indicates that he needs supervision and treatment efforts to avoid recidivism.

Dr. Flesher also relied on other factors in concluding that Pruitt was likely to commit repeat acts of sexual violence. These included "evidence of his behavior in terms of ability or willingness to control behavior to conform to social and legal norms as well as indication of his probability of recidivism as represented by the actuarial instruments." Dr. Flesher noted that Pruitt incurred a "higher than average" number of disciplinary reports while in prison. He thought that if Pruitt could not control his behavior in a highly supervised prison setting, he would not be able to control his behavior in the community where he would be relatively unsupervised.

Finally, both State experts concluded that Pruitt had serious difficulty controlling his dangerous behavior, namely "[w]indow peeping unsuspecting people and then invading homes for sexual purposes." Dr. Grimmell had four primary reasons for concluding that Pruitt's mental abnormality or personality disorder made it seriously difficult for Pruitt to control his dangerous behavior. These were:  (1) his diagnosis of voyeurism; (2) his diagnosis of antisocial personality disorder; (3) his offenses while on release; and (4) his offenses while in prison. He testified that "since the factors that drive [Pruitt's] offense risk have not yet received effective treatment," Pruitt would resume his pattern of offending when he was released from a controlled setting. Dr. Flesher's opinion was based on Pruitt's disciplinary record, criminal history, behavior on probation and

6

parole, and his behavior during the sexual predator treatment program which "suggested some . . . guardedness, noncooperation, [and] inability to follow rules . . . ."

Dr. Grimmell did note that the last time Pruitt indicated an interest in sexual offending was in 2009 when he received two disciplinary reports for lewd conduct. On two occasions within a two-day period, Pruitt intentionally masturbated in view of others. Dr. Grimmell believed the fact that Pruitt had not committed additional lewd offenses showed that he was able to learn how to control his behavior. In his report, he states: "The burned hand appears to have taught best; [Pruitt] has not repeated the experiment within KDOC." Despite this, Dr. Grimmell believed that Pruitt would have difficulty controlling his behavior outside of a controlled setting because the factors that drove his offenses had not yet received effective treatment.

The jury found that Pruitt was a sexually violent predator.

Pruitt appealed.

ANALYSIS

In order to establish that someone is a sexually violent predator and, therefore, subject to involuntary commitment in a state treatment facility, the State must prove, beyond a reasonable doubt, four elements:

> "(1) the individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior." *In re Care & Treatment of Williams*, 292 Kan. at 106.

7

In this case, the parties stipulated to the fact that Pruitt committed a sexually violent offense. In addition, Pruitt agrees that there was sufficient evidence to conclude that Pruitt suffers from a mental abnormality or personality disorder. Pruitt challenges the sufficiency of the evidence to support the jury's findings related to elements 3 and 4. We will address each in turn, but first we set out our standard of review.

When the sufficiency of the evidence is challenged in a sexually violent predator case, this court "asks whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced a reasonable factfinder could have found the State met its burden to demonstrate beyond a reasonable doubt that the individual in question is a sexually violent predator." 292 Kan. at 104.

*There was sufficient evidence presented for the jury to find that Pruitt was likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder.*

Pruitt argues that the State presented insufficient evidence to prove beyond a reasonable doubt that he was likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder.

Pruitt contends that the State's evidence on this point consisted of his diagnoses of voyeurism and antisocial personality disorder, prison disciplinary reports, probation reports, and the two Static instruments. However, the State's evidence was more expansive. For example, Dr. Grimmell testified that deviant sexual arousal was one of the strongest and most consistent risk factors present in Pruitt. Dr. Grimmell also testified that Pruitt was at a higher risk of reoffending because he had failed to complete sex offender treatment on three occasions. Failure to complete treatment "predicts greater risk of sexual offending in the future." Dr. Flesher administered the Stable-2007 and Acute-2007. Pruitt's scores on the tests indicated high treatment and supervision needs. The

8

evidence presented provided ample support for the experts' conclusions that Pruitt was likely to commit repeat acts of sexual violence.

Pruitt lodges specific criticism against the experts' reliance on the disciplinary reports. He asks this court to "consider the nature of inmates." He cites Dr. Grimmell's estimate that up to 75 percent of the male prison population is diagnosable with antisocial personality disorder. Pruitt then argues that "[i]f an individual is in prison and up to 75% of the population suffers from antisocial personality disorder, it should be no surprise that an individual would have disciplinary infractions in prison." Pruitt's criticism misstates the experts' concerns. The State's focus on the disciplinary reports was the quantity, not the mere presence, of disciplinary reports. Dr. Flesher testified that Pruitt had a "higher than average" number of disciplinary violations. This supports the State's argument that Pruitt is more likely than an average sex offender to reoffend.

Pruitt also takes issue with the Static instruments relied on by the State's experts. He argues that "[t]here is not an actuarial tool that is sufficiently accurate to involuntarily commit someone, possibly for life." Pruitt's argument is unpersuasive. The Static instruments were not the sole factor relied upon by the State's experts. Even without the Static instruments, the State presented sufficient evidence that Pruitt was likely to reoffend. In *In re Care & Treatment of Williams*, No. 99,235, 2009 WL 2762455, at *6-7 (Kan. App. 2009) (unpublished opinion), this court found that there was insufficient evidence to support a jury verdict that Darwin Williams was a sexually violent predator. The primary factor in the Court of Appeals' decision was that Williams' score on actuarial instruments placed him at a 29 to 40 percent risk of reoffending, which "appear[ed] to be rather low in comparison to other defendants who have been found to be sexually violent predators." 2009 WL 2762455, at *6. The State appealed, and argued that the Court of Appeals "put undue weight on actuarial test scores." *In re Care & Treatment of Williams*, 292 Kan. at 97. The Kansas Supreme Court agreed and reversed the Court of Appeals. 292 Kan. at 115.

The court noted that, while the State's experts considered the actuarial tests, they "emphasized other factors as the basis for their opinions." 292 Kan. at 109. The court concluded that "other evidence could convince a rational factfinder that the State has met its burden beyond a reasonable doubt, especially when, as in this case, both experts based their opinions on factors other than the tests." 292 Kan. at 111. The other evidence included Williams' behavior before and during his incarceration, his diagnoses of antisocial personality disorder and paraphilia, his admitted difficulty controlling his alcohol and drug use, and concerns from the professionals who oversaw Williams' participation in a sex offender treatment program. 292 Kan. at 114.

Here, as in *In re Care & Treatment of Williams*, the State's experts presented evidence other than the actuarial instruments to support the finding that Pruitt was likely to reoffend. Pruitt committed multiple criminal offenses, violated probation and parole, accumulated a higher than average number of disciplinary reports, and failed to complete sex offender treatment which may have helped him address the problems that led to his offenses. The results from the Static instruments buttressed the rest of the evidence on this issue. The evidence, when viewed in the light most favorable to the State, supports the jury's finding that Pruitt was likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder.

*There was sufficient evidence for the jury to find that Pruitt has serious difficulty controlling his dangerous behavior.*

Pruitt argues that the State presented insufficient evidence to prove beyond a reasonable doubt that he had serious difficulty controlling his dangerous behavior.

Pruitt notes that the State's experts diagnosed him with voyeurism and antisocial personality disorder. He then argues that "the State cannot just assume that either or both of these disorders make it seriously difficult for the individual to control his dangerous

10

behavior. The State is required to show it." Pruitt argues that Dr. Grimmell made a conclusory finding, without support, that Pruitt had serious difficulty controlling his dangerous behavior. Pruitt also argues that Dr. Flesher's report did not address this element at all, and that his testimony was "conclusory and consisted of one answer, five lines long." Pruitt highlights Dr. Grimmell's testimony in which he said that Pruitt apparently learned not to engage in lewd conduct in prison after his 2009 disciplinary reports.

As with the previous issue, the State's evidence on this issue was more expansive than Pruitt acknowledges. Dr. Grimmell did not make a conclusory finding based only on Pruitt's diagnoses. In addition to Pruitt's diagnoses, Dr. Grimmell considered the fact that Pruitt reoffended while on supervised release. Dr. Grimmell also considered Pruitt's admission that he had "reoffended by peeping on both family members, neighbors, and strangers, although these did not result in convictions." Additionally, because Pruitt did not receive treatment for the factors underlying his behavior, Dr. Grimmell believed that Pruitt was likely to continue engaging in the behavior when he was released into an uncontrolled environment. Dr. Flesher's findings were also not conclusory. Similar to Dr. Grimmell, Dr. Flesher cited Pruitt's "criminal history, his behavior on probation/parole, and his behavior during the treatment program" in support of his conclusion that Pruitt was likely to reoffend. Pruitt's past behavior had already been extensively discussed at that point in the trial, and so there was no need for Dr. Flesher to elaborate.

When viewed in the light most favorable to the State, a reasonable fact-finder could conclude that Pruitt has serious difficulty controlling his dangerous behavior. Accordingly, the verdict is affirmed.

Affirmed.

11