NOT DESIGNATED FOR PUBLICATION

No. 117,677

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of
ALEJANDRO GARCIA.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; R. WAYNE LAMPSON, judge. Opinion filed March 23, 2018. Affirmed.

*Dwight R. Carswell*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellant.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Kansas City, for appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and BRUNS, JJ.

PER CURIAM: The State appeals the district court's finding that the State failed to meet its burden of proof to establish that Alejandro Garcia was a sexually violent predator. It raises two issues on appeal, the failure of Garcia to disclose his expert witness' report until the middle of the trial and the erroneous admission of testimony concerning two projective tests used by Garcia's expert. The State argues that these errors should result in a new trial.

A party who fails to disclose expert testimony which it may use at trial cannot use that information at trial unless the party's failure was substantially justified or harmless. K.S.A. 2017 Supp. 60-237(c)(1). Alejandro Garcia provided the State with an executive summary of his expert's report, but did not provide the report itself. When this was

1

discovered during trial, the district court ordered Garcia to provide the report to the State. The district court allowed Garcia's expert to testify after finding that the failure to disclose was harmless. We find that this decision did not constitute an abuse of discretion because the State had an opportunity to adequately address the expert's report after it was provided. Additionally, the summary provided an overview of many of the conclusions in the report.

As to the State's second issue on appeal, for an expert to testify in a sexually violent predator proceeding, the facts or data relied upon by the expert must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." K.S.A. 2017 Supp. 59-29a06(c). Garcia's expert used two projective tests—the Rorschach inkblot test and the House-Tree-Person test. The expert testified that the tests were generally accepted by psychologists, but he did not provide any evidence that they were routinely used for the purpose of sexually violent predator determinations. Thus, the district court erred in allowing evidence of the projective tests. But we find that this error was harmless as the primary result from the tests—absence of aggressive tendencies—was established by other evidence. Additionally, the district court ruling relied on evidence other than the projective tests in reaching its conclusion that the State had failed to meet its burden of proof. Accordingly, the decision of the district court denying the State's motion for a new trial is affirmed.

FACTUAL AND PROCEDURAL HISTORY

In 2003, Alejandro Garcia was convicted of one count of rape and two counts of criminal sodomy with a child less than 14, and he was sentenced to 166 months' incarceration. Garcia was 22 years old at the time of his sentencing.

During his incarceration, Garcia completed the prison sex offender treatment program (SOTP). While in the program, he admitted to engaging in sexual contact with

multiple children and animals. He filled out a total of 47 "victim sheets" in which he identified sexual offenses, his age and the victims' ages at the time of the offense, where the offenses occurred, and whether he was caught.

Garcia said that the victim sheet exercise helped him identify the harm that he had caused and understand how the behavior was unacceptable. Before being incarcerated, Garcia thought of a victim as someone who was physically forced to do something, for example, by being beaten up or threatened with a weapon. After treatment, he said that a victim could include "[a]nyone who was manipulated into a behavior that, number one, isn't acceptable; and number two, that they didn't want."

Garcia was able to recite many coping skills and mechanisms that he learned in SOTP. These included being self-aware, knowing his intentions and motive, staying in prayer and meditation, understanding his relationship with others, focusing on improving himself, treating others better, being cognizant of his triggers, and discussing his triggers with the people who support him. Garcia also had several long-term goals, which included maintaining a healthy lifestyle, being a positive influence for his children, opening a small woodworking shop, maintaining healthy relationships, and continuing to go to church, 12-step program meetings, and aftercare therapy. Garcia already had an appointment at an aftercare treatment center for sex offenders in case he was released.

Garcia's SOTP treatment provider kept weekly progress notes. These notes showed that Garcia participated in all sessions. The notes state that Garcia's participation was meaningful and insightful, and that he worked diligently on his assignments. The treatment provider thought that Garcia was taking treatment seriously. However, contrary to all prior reports, Garcia's SOTP discharge summary provided that Garcia had not internalized the information. Specifically, it said that Garcia "'appeared to relate this knowledge at a surface level due to a lack of emotional connection to the material.'"

3

In addition to the SOTP program, Garcia obtained his GED and received vocational training for woodworking. During his incarceration, Garcia had a job restoring furniture and building custom furniture. He had a contracting job ready for him upon his release from prison. Garcia had family members who visited him regularly in prison, and he planned to stay with them upon his release.

In the 11 1/2 years that Garcia was in prison, he only received four disciplinary reports. His last write-up was in 2007. None of his disciplinary reports were for sexual offenses. His final report arose out of Garcia's participation in the Lucky Dog program. Through this program, inmates are given dogs to train and rehabilitate before adopting them out. Garcia had a dog that had trouble with barking. Inmates were taught to train the dogs not to bark using positive reinforcement, but they could also use muzzles if necessary. Garcia forgot his muzzle in his dorm one day, so he tried to make a makeshift muzzle out of tape. Garcia wrapped the tape around his hand, sticky side out, and tried to place it on the dog. The dog tried to get it off and Garcia removed it. A corrections officer saw Garcia removing the muzzle and wrote him up for animal cruelty. Garcia was expelled from the program, but he was subsequently allowed to return to it.

In anticipation of his release from incarceration, in 2015, the State filed a petition for Garcia to be involuntarily committed into Kansas' sexually violent predator program. To establish that someone is a sexually violent predator, the State must prove four elements beyond a reasonable doubt:

> "(1) [T]he individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior." *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011).

4

Garcia elected to have a bench trial. Garcia testified, and he also called Dr. Gerald K. Gentry to testify in his defense. The State presented two expert witnesses who evaluated Garcia—Dr. Rebecca Farr and Dr. Bradford Sutherland.

Both of the State's experts thought that Garcia met the criteria to be committed as a sexually violent predator. Both experts diagnosed Garcia with pedophiliac disorder, sexually attracted to females, nonexclusive type. They also each diagnosed Garcia with mild alcohol use disorder and mild cannabis use disorder. Additionally, Dr. Farr diagnosed Garcia with antisocial personality disorder. Dr. Sutherland was unsure whether to make this diagnosis. However, he had not reviewed Garcia's victim sheets prior to evaluating Garcia. After seeing the victim sheets, Dr. Sutherland concurred that Garcia had antisocial personality disorder.

The State's experts concluded that Garcia's diagnoses made Garcia more likely to engage in repeat acts of sexual violence. The experts examined both static and dynamic factors in coming to their conclusions.

Dr. Farr relied upon two actuarial tools in her evaluation of Garcia—the Static-99R and the Static-2002R. Dr. Sutherland only administered the Static-99R. Garcia scored a 3 on the Static-99R, which placed him in the low-moderate category of reoffending. Garcia scored a 7 on the Static-2002R, which placed him in the moderate-high risk category. Dr. Farr opined that the Static instruments underestimate the risk of reoffending, because they only measure an offender's risk of being arrested, charged, or convicted of another offense within the five years after release. However, she believed that the Static instruments were the best tools that mental health professionals have to predict the probability of recidivism rates. Dr. Gentry testified that peer-reviewed literature on the Static instruments showed that they were "moderately successful at predicting recidivism."

Dr. Sutherland also considered a number of dynamic risk factors in concluding that Garcia was likely to commit repeat acts of sexual violence. The first factor was sexual preoccupation. Garcia had over 30 consensual sex partners, 12 prepubescent victims (under the age of 13), 6 adolescent victims (between ages 13 and 16), three victims over the age of 16, and several animal victims. The second factor was deviant sexual preferences. Garcia had exhibited attraction towards animals and prepubescent children, urinated on his victims, viewed child pornography, and stolen underwear to masturbate with. Third, Dr. Sutherland believed Garcia used sex as a coping mechanism—he exercised power and control over his victims to deal with his own emotional distress. The fourth factor was Garcia's poor problem-solving skills, which was based on his poor employment history, poor education history, and history of drug and alcohol use. The fifth factor was impulsive acts. Dr. Sutherland noted a "linear progression of sexual offending beginning in adolescence and becoming progressively worse in severity and frequency on into adulthood." The sixth factor was lack of empathy and remorse for his victims. This was based on the fact that Garcia was unable to describe the emotional reactions that some of his victims had while he was sexually offending them. To Dr. Sutherland, this indicated that Garcia was unable to recognize distress cues. The seventh factor was general social rejection. Dr. Sutherland thought Garcia's relationships lacked reciprocity and intimacy. The eighth factor was hostility toward women. Garcia's sexual offending pattern indicated a need for dominance and were coercive in nature, using "anger and threats of rejection in order to have [his victims] submit to sexual behaviors."

Finally, the State's experts concluded that Garcia had serious difficulty controlling his dangerous behavior. Dr. Sutherland cited the dynamic risk factors previously discussed as examples of how Garcia had not demonstrated that he could control his behavior in an unstructured environment. Dr. Farr considered three primary things. First, she considered the fact that Garcia admitted to having a large number of victims for which he had not been apprehended. Second, she considered the variety of deviant sexual

6

behaviors that he had exhibited, such as offending against animals, habitually viewing and masturbating to child pornography, urinating on people, and assaulting victims while they were sleeping. Third, she testified that the professionals who conducted the SOTP program said that Garcia's participation in treatment was superficial. While Garcia was able to relay the concepts he learned, he did not actually internalize the information. Dr. Farr also considered the fact that Garcia had only received four disciplinary reports in his 11-year incarceration, the last of which was in 2007. She thought that this showed that Garcia was "able to control himself better in a structured environment than the community."

Dr. Gentry testified for Garcia. Dr. Gentry has a Ph.D. in Clinical Psychology from the University of Kansas, has been working with sex offenders for 30 years, and for 14 years served as Chief Psychologist at Osawatomie State Hospital. Based on his evaluation, Dr. Gentry concluded that Garcia experienced a significant positive change over the course of his incarceration. He thought that Garcia had taken his SOTP treatment seriously. He disagreed with the contention that Garcia had not internalized the material that he learned in SOTP. This conclusion was based upon the SOTP discharge summary, which indicated that Garcia's participation in the program was superficial. Dr. Gentry thought this conclusion was contradicted by the weekly progress notes, which showed that Garcia was participating meaningfully in the program. Dr. Sutherland had also noted that the discharge summary was "diametrically different" from the SOTP progress notes. Furthermore, Dr. Gentry thought that there was "ample evidence that [Garcia] has empathy for his victims." He questioned why Dr. Farr would conclude that Garcia lacked empathy, when Garcia "broke down and cried during her interview when talking about his daughter." When Dr. Gentry brought up Garcia's children in his interview, Garcia again began to cry. Dr. Gentry also thought Garcia's lack of disciplinary reports was significant because it suggested that Garcia "worked pretty hard to gain self control." Dr. Gentry thought that Garcia had a good chance of success upon release due to his job training, supportive family, and prison disciplinary record. Dr. Gentry concluded that

based on what he had read and learned about Garcia, he did not think that Garcia would have done as well in prison if he had not internalized positive change.

Dr. Gentry was concerned that the State's experts relied "almost exclusively" on historical information from before Garcia's incarceration. Because of this, they failed to take account of "what may or may not have changed in the 15 years since [Garcia] was sentenced for his crimes." Dr. Sutherland countered that he did consider facts from Garcia's 15 years of incarceration. He pointed out that Garcia got his GED, participated in several programs, and had only a few disciplinary reports. However, he did not think that they were relevant to whether Garcia was likely to reoffend because there was "no research to indicate that completing these kind of things while incarcerated will increase or decrease the risk of sexual recidivism."

As part of his examination of Garcia, Dr. Gentry administered a Rorschach technique, commonly called the inkblot test. In this test, the subject is shown a series of 10 cards with inkblots on them. The subject describes what he or she sees. Then, the subject and psychologist go through the cards again and the psychologist asks the subject questions about his or her responses. Dr. Gentry also administered a House-Tree-Person test. For this test, psychologists ask subjects to draw a picture of a person, a picture of a house, and a picture of a tree. Sometimes psychologists will vary the request, and ask subjects to draw a family or a picture of themselves. Then, the psychologist asks questions about the pictures, such as how old the person in the drawing is, what the person is doing, how the person is feeling, and what the person is thinking about. Dr. Gentry made two primary findings from the tests: the absence of aggressive tendencies and the presence of considerable anxiety. The State challenged the admissibility of the projective tests under both *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), but the district court overruled the State's objection.

8

During his testimony, Dr. Gentry referred to an eight-page report that he had created. However, defense counsel only provided the State's attorney with an executive summary of the report prior to trial. The State's attorney asked the court for the eight-page report, and the court ordered the defense to provide the report to the State. The State's attorney reviewed the report with Dr. Sutherland for approximately 20 minutes. When Garcia offered the report into evidence, the State objected on the grounds that it had insufficient time to review the report. The district judge noted the objection but said that the State had "adequate time" to view the report. The district judge said that the State's questions, after reading the report, adequately dealt with the State's concerns.

At the end of the trial, the district court found that the State failed to meet the burden of proof. The court ordered that Garcia should be immediately discharged.

The State filed a motion for a new trial or to alter or amend the judgment. The State argued that Garcia "ambushed the State by withholding his expert's report prior to trial contrary to the dictates of K.S.A. 60-226(b)(6)." The State also argued that Dr. Gentry's testimony regarding the Rorschach and House-Tree-Person tests should have been excluded under the *Daubert* or *Frye* tests for admissibility of expert opinion evidence. The district court denied the motion.

The State appealed.

ANALYSIS

Before we begin our analysis, we pause to note that there can be no dispute that Garcia's behavior leading up to his incarceration was abhorrent. But this case is not about punishing him for past misdeeds. He was punished by a court of law for his crimes— which resulted in over 11 years of incarceration in prison. This case is about whether the State should have a second opportunity to present evidence to involuntarily commit

9

Garcia for an indeterminate amount of time as a sexually violent predator because of procedural errors it alleges the district judge committed regarding the admission of evidence at his bench trial.

In order to commit someone as a sexually violent predator, the State must prove beyond a reasonable doubt:

"(1) [T]he individual has been convicted of or charged with a sexually violent offense, (2) the individual suffers from a mental abnormality or personality disorder, (3) the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and (4) the individual has serious difficulty controlling his or her dangerous behavior." *In re Care & Treatment of Williams*, 292 Kan. at 106.

In this case, the parties requested a trial to the court, not a jury. After hearing all the evidence over several days of trial, the district court found that the State failed to meet this burden of proof. The State does not challenge that finding on appeal. Instead the State argues that it should be granted a new trial because Garcia's counsel failed to provide it with a copy of his expert witness' full eight-page report prior to trial and it allowed evidence regarding the results of two tests that expert had Garcia complete. Accordingly, our sole task is to determine if the district judge abused his discretion in denying the State's motion for a new trial on that basis. In conducting that analysis, we are not allowed to substitute our judgment for that of the district judge. Whether we would have come to the same conclusion regarding Garcia's release is irrelevant. With that in mind, we will proceed to examine the narrow issue presented.

*The district court did not abuse its discretion in denying the State's motion for a new trial.*

The State argues that Garcia's failure to disclose Dr. Gentry's report constituted grounds for a new trial. In its motion for a new trial, the State noted that the report contained criticisms of its experts. However, because the State was unaware that such criticisms would be raised, it had already released Dr. Farr from subpoena by the time it discovered the existence of the report. The State also argued that it and Dr. Sutherland did not have sufficient time to prepare for rebuttal after receiving the report. The State now argues that the district court abused its discretion in denying its motion for a new trial.

A new trial may be granted for "[a]buse of discretion by the court, misconduct by the jury or an opposing party, accident or surprise that ordinary prudence could not have guarded against, or because the party was not afforded a reasonable opportunity to present its evidence and be heard on the merits of the case." K.S.A. 2017 Supp. 60-259(a)(1)(A). It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 2017 Supp. 60-259(a). A ruling on a motion for new trial will not be disturbed on appeal except upon a showing of abuse of discretion. *Miller v. Johnson*, 295 Kan. 636, 684, 289 P.3d 1098 (2012). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

The State argues that the district court's decision was based on an error of law because the court failed to adhere to the requirements in K.S.A. 2017 Supp. 60-237(c)(1). This statute provides in part:

11

"(c) *Failure to disclose, to supplement an earlier response or to admit*.

(1) *Failure to disclose or supplement*. If a party fails to provide information or identify a witness . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing or at a trial, unless the failure was substantially justified or is harmless." K.S.A. 2017 Supp. 60-237(c)(1).

First, the State argues that the district court never made a finding that Garcia's failure to provide the report was harmless. We disagree. While the district court did not use the word harmless, the court did imply it when it said that the State had "adequate time" to review the report, and when it said that the State's questioning of Dr. Gentry dealt with many of its concerns. The State did not object to the district court's findings or file a motion for additional findings. "Where no objection is made, this court will presume the trial court found all facts necessary to support its judgment." *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006).

Second, the district court's harmlessness finding is supported by the record. An error is harmless if the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). In this case, allowing Dr. Gentry to testify about his report constituted harmless error.

The State's brief contains three pages detailing the information that was included in the report but omitted from the summary. But some of the information the State lists was established by evidence independent of Dr. Gentry's report and other information was actually in Dr. Gentry's summary. Finally, the State addressed, or had an opportunity to address, the information exclusive to the report after the court ordered Dr. Gentry to provide it to the State. We will examine each category of evidence.

12

*Evidence established by testimony independent of the report*

Many of the issues the State raises were established by testimony independent of the report. In *Frans v. Gausman*, 27 Kan. App. 2d 518, 528, 6 P.3d 432 (2000), this court held that the trial court erroneously admitted evidence in violation of K.S.A. 1999 Supp. 60-237(c)(1). But, the court held that the error was harmless because another expert's testimony had established the same thing. 27 Kan. App. 2d at 528-29.

For example, Dr. Gentry's report states that Garcia requested one-on-one counseling while incarcerated. The report then states that "[t]his information directly contradicts the claim made by Dr. Sutherland that Mr. Garcia 'has not actively sought [mental health] services in the form of individual or group counseling while incarcerated.'" The State argues that it was prejudiced because this claim was not included in Dr. Gentry's summary. However, even if Dr. Gentry's report had been excluded this evidence would have been established by Garcia's testimony. During the trial, Garcia testified that he requested but did not receive one-on-one counseling. Even without Dr. Gentry's report, the district court could have noted that Garcia's testimony contradicted Dr. Sutherland's claim.

The State also raises the fact that Dr. Gentry's report criticized Dr. Farr for characterizing the incident with the dog muzzle as animal cruelty. However, Garcia's attorney raised this criticism during his cross-examination of Dr. Farr. He asked: "[Y]ou referenced this several times, that the animal cruelty that [Garcia] was written up for was something that concerned you. Can you describe the animal cruelty to me?" Dr. Farr recited the facts of the disciplinary report. Garcia's counsel asked again how the scenario could constitute animal cruelty when the dog training program Garcia participated in gave the participants muzzles to use on the dogs. Dr. Farr concluded: "[H]e used tape to put around the dog's mouth. It was prohibited. The officer—they had a hearing on it, which is the same thing as a court process, and he was found to have violated the

13

published orders, and I think that's what the important piece is." This line of questioning provided Dr. Farr with an adequate opportunity to address the issue. It also shows that the issue was raised independently of Dr. Gentry's report or testimony.

Similarly, the State complains that Garcia's failure to provide Dr. Gentry's report prejudiced them because they did not know that he would raise the conflict between Garcia's positive SOTP progress notes and the negative discharge summary. However, this issue could have been raised with or without Dr. Gentry's report. The difference between the progress reports and discharge report constituted the facts of the case, not an opinion by Dr. Gentry. Garcia's attorney asked Dr. Farr to read a number of progress notes from the SOTP program. He then stated: "Every one of these talks about [Garcia's] attentive behavior and participation. Explain why these are not matching up with the report that you've written." Dr. Farr replied that she relied on the discharge summary in her report because it gave her an idea of how Garcia performed "from start to finish." She added: "The understanding of the materials is what was written in the discharge summary. So I guess you would have to ask those treatment providers why they wrote what they wrote." Garcia did not rely on Dr. Gentry's expert testimony alone to establish that there was a discrepancy between the progress notes and discharge summary. Furthermore, in his executive summary Dr. Gentry cited "glowing reports from the SOTP leader" so the State was on notice that Garcia would focus on the positive aspects of his SOTP treatment notes.

Some of the issues raised by the State were addressed fully at trial, and remanding the case to allow the State more time to prepare would likely have no impact on the ultimate outcome. For example, the State notes that Dr. Gentry did not put them on notice that his report would state: "Dr. Farr expresses dismay that Mr. Garcia has masturbated 500 times (obviously an estimate) while incarcerated. I calculate the frequency to be once/week." During Dr. Gentry's cross-examination, the State's attorney pointed out to him that Dr. Farr's report actually stated that Garcia had admitted to viewing and

masturbating to pornography on over 500 occasions before his incarceration. The State's attorney said: "So your testimony that he had masturbated 500 times while in custody, that was an incorrect assumption on your part, correct?" Dr. Gentry agreed. Because Dr. Gentry's mistake was corrected on the stand, it is unnecessary for Dr. Farr to address the issue.

The State raises another similar issue, arguing: "Dr. Gentry's report criticized the State's experts for stating that the Static actuarials underestimate the risk of recidivism over a person's lifetime, claiming (incorrectly) that this statement is inaccurate. . . . Dr. Gentry repeated this criticism at trial . . . , but it was not contained in his summary." What Dr. Gentry testified was that a person's Static score decreases over time because Static instruments account for the fact that likelihood of aggression diminishes with age. However, from both Dr. Farr's report and her testimony it is clear that when she said the Static instruments underestimate risk of recidivism, it is because they only assess the likelihood that a person will be arrested or convicted for a new offense within five years of being released back into the community. The Static instruments do not account for offenses which are not detected. For that reason, they underestimate actual recidivism. It is not necessary to remand for further testimony on this issue because the facts are clear—a person's Static score will decrease over time because of age, but the Static score is still an underestimate because it can only account for crimes that are discovered. Additionally, the State had the opportunity to address this issue more explicitly when it recalled Dr. Sutherland. Therefore, the State was not prejudiced by Dr. Gentry's omission of this criticism from his summary.

*Evidence that was contained in Dr. Gentry's summary*

A few of the things the State complains about actually were included in the summary. "[E]xpert disclosures are not meant to disclose every detail of testimony that an expert is expected to give." *Foster v. Klaumann*, 42 Kan. App. 2d 634, 680, 216 P.3d

15

671 (2009), *rev'd on other grounds*, 296 Kan. 295, 294 P.3d 223 (2013). Here, Dr. Gentry's summary put the State on notice of several things that it now takes issue with, including his use of projective drawings, his results from the projective drawing tests, his criticism that the State's experts relied too heavily on historical information, and his positive opinion of Garcia's good behavior in jail.

The State argues that it was prejudiced because Dr. Gentry's summary merely stated that he used projective drawings and did not specify that he used the House-Tree-Person test—a projective drawing test. But the record does not support a finding of prejudice. Contrary to claims that it was surprised about the projective tests, Dr. Gentry included the findings from his administration of the projective drawings in his summary—the presence of significant anxiety and the absence of aggressive content in the drawings. Dr. Gentry did not add much beyond what was in his summary at trial or in his report, other than to explain what the House-Tree-Person test is. Contrary to the State's allegation that it did not know which tests were used prior to the revelation of the eight-page report, Dr. Sutherland testified that Dr. Gentry performed a MMPI-2, the Rorschach test, and the House-Tree-Person test in his direct testimony, before the State even became aware of the eight-page report. And, more importantly, he testified to their shortcomings. Moreover, Dr. Sutherland was also given an opportunity to testify as to his knowledge of projective drawings after he read the report. Because the State was aware that Dr. Gentry used projective drawings and the conclusions Dr. Gentry drew from the drawings, it had adequate opportunity to counter his findings with its own experts. And, the State did counter some of this evidence when it recalled Dr. Sutherland to testify. Thus, the admission of Dr. Gentry's report was harmless as to this issue.

The State notes that one of Dr. Gentry's main themes at the trial was that the State's experts' conclusions were based on outdated historical information. It then asserts that the argument "was nowhere mentioned in his summary." However, Dr. Gentry's executive summary does mention that "[t]he 'actuarial instruments' relied upon by the

16

KDOC and LSH staff and consultants who interviewed Mr. Garcia are checklists or rating scales that focus almost exclusively on acts and circumstances that occurred prior to his imprisonment." Furthermore, when Dr. Sutherland was recalled to testify after reviewing Dr. Gentry's report he addressed this criticism. Therefore, this information did not harm the State.

Similarly, the State complains that Dr. Gentry's summary omitted his opinion that Garcia's good behavior in jail was evidence that Garcia experienced a positive change in prison. However, this information was included in the summary, which noted Garcia's good behavior in prison, positive reports from SOTP staff, lack of disciplinary reports, and accumulation of almost two years of good time credit. Dr. Gentry also stated that "Garcia's record over the past 13 years has, in many ways, been exemplary." Dr. Gentry concluded that this was one factor that supported Garcia's release from custody. Thus, the State was on notice that Garcia's conduct while incarcerated might be an element of Dr. Gentry's testimony. Additionally, the State had an opportunity to attack Dr. Gentry's conclusion. Dr. Sutherland testified that he did not think that Garcia's behavior during incarceration either increased or decreased his risk of recidivism.

*Evidence that was not included in Dr. Gentry's summary*

Finally, there were two criticisms of Dr. Farr that the State did not get an opportunity to address. First was Dr. Gentry's criticism that Dr. Farr used the word "victim" to describe some of the people in Garcia's victim sheets. It is likely that Dr. Farr described these persons as victims because Garcia himself did. Second, both State experts included a quote from the SOTP discharge summary that Garcia lacked an emotional connection to the material. Dr. Gentry criticized them for this, noting that in Dr. Farr's interview with Garcia he began to cry when she asked him about touching his one-year-old daughter. This information was inconsequential in light of all of the evidence. It is

17

highly unlikely that the outcome of the trial would have been different if the State's experts had been aware of these specific criticisms before trial.

In sum, we find that the district court correctly held that admission of Dr. Gentry's report was harmless. The State's intense questioning of Dr. Gentry and its examination in rebuttal of Dr. Sutherland adequately dealt with its concerns regarding the report. The aspects of the report which the State did not get an opportunity to address were minor and likely had no effect on the outcome of the case. The district judge showed a clear understanding of the strengths and weaknesses of each parties' positions by many of the questions he asked. Thus, the district court did not abuse its discretion in denying the State's motion for a new trial.

*The district court's allowance of expert testimony regarding projective tests was harmless error.*

The State also argues that Dr. Gentry's testimony based on the Rorschach and House-Tree-Person tests should have been excluded under either the *Frye* or *Daubert* standard. Garcia does not address the admissibility of the tests and only argues that their admission was harmless because there was no indication that the district court relied on Dr. Gentry's findings from the projective tests. For this reason, we will assume for purposes of this opinion that the district court erred in admitting the test results and proceed to the harmlessness inquiry.

Error in admitting or excluding evidence is not grounds for disturbing a judgment unless the error affects a party's substantial rights. K.S.A. 2017 Supp. 60-261. Where the error affects a statutory right, the party benefitting from the error must persuade the court that "there is no reasonable probability that such error affected the outcome of the trial in light of the entire record." *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

18

The State argues that the error is not harmless. It asserts that "[i]f Dr. Gentry had not been allowed to offer his opinion based on the Rorschach and House-Tree-Person tests, there is a reasonable probability that the outcome of the trial would have been different." Garcia states that "there is no indication that the Court considered either test when making a decision in this case." He notes that the district court did not mention the tests in either its ruling on the record at trial or in the journal entry denying a new trial.

The State argues that the tests informed Dr. Gentry's opinion, and that "it is impossible to set the Rorschach and House-Tree-Person tests aside and conclude that Dr. Gentry would have reached the same conclusions without them." It argues that the Rorschach and House-Tree-Person tests were the foundation for Dr. Gentry's conclusion that Garcia is not likely to reoffend. We disagree, as did the district court.

Dr. Gentry testified that the two tests were merely "pieces of the puzzle" in evaluating someone. He formed his conclusions after interviewing Garcia, reviewing Garcia's prison records, and conducting psychological tests, personality tests, and projective tests. He testified:  "If I get one thing from a Rorschach but it's not repeated anywhere else in the interview or the other testing or I can't find independent verification in the records, then . . . that hypothesis is discarded." For example, one thing Dr. Gentry found in his projective testing was the absence of aggressive content. This conclusion could also be reached by reviewing Garcia's prison records, which showed that Garcia was a compliant inmate. It could also be reached through the testimony of the numerous prison officials who testified at Garcia's trial. Several corrections officers testified that Garcia was not a troublemaker, and one testified that he had been a "role model" inmate. This shows that the projective tests are not the only foundation for Dr. Gentry's opinion that Garcia was not likely to reoffend. Rather, Dr. Gentry came to this conclusion after considering the evidence as a whole.

The rules as to admissibility of evidence are the same whether the trial be had by the court with or without a jury. But "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346, 102 S. Ct. 460, 70 L. Ed. 2d 530 (1981). We expect that judges are able to sift the wheat from the chaff. Here, Dr. Gentry admitted, and Dr. Sutherland agreed, that projective tests by themselves are not predictive of future acts of sexual violence. The district judge had that information. He further recognized, by his comments, the competing experts were each arguing that the tests they used were individually just a "piece to the puzzle."

When it came time to enter a decision in the case, the district judge did not indicate that he placed much weight on Dr. Gentry's projective testing. One of the primary factors in the court's ruling was the discrepancy between Garcia's SOTP progress notes, which showed his participation in treatment was thoughtful, meaningful, and insightful, and his discharge summary, which indicated he had not internalized the training. This discrepancy was highlighted most effectively by defense counsel's cross-examination of Dr. Farr. The district judge also noted that the State's doctor testified that Garcia only had a one in five chance of reoffending. Finally, the court was convinced by Garcia's testimony, and Dr. Gentry's testimony "that the basis upon which the witnesses for the State formed their opinions was not as solid as they indicated." Unlike other things in his report, Dr. Gentry's projective testing did not challenge the basis for the State's opinions. Even without the projective drawing evidence the district court still could have concluded that the State's experts did not have a solid basis for their opinions. Paraphrasing Justice Rosen's dissent in *In re Care & Treatment of Williams*, 292 Kan. at 115, the district judge ruled that "involuntary commitment under the statute requires the State to meet the highest of burden[s] and should afford those accused the greatest protections that the law allows," and the State had failed to meet its burden of proof.

So even assuming that the admission of the projective tests was erroneous, the error was harmless. There is no reasonable probability that the district court would have reached a different conclusion if the projective drawings had not been admitted into evidence.

*Cumulative error does not require reversal.*

Finally, the State argues that cumulative error requires reversal. However, the district court only erred by admitting the projective drawings. It did not err in allowing Dr. Gentry to testify about his expert report. The cumulative error "doctrine does not apply if no error or only one error supports reversal." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). Therefore, the doctrine does not apply in this case.

Affirmed.